UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

STEVEN BARNEY,

                         Petitioner,          **No. 03-CV-0758(VEB)**
         -vs-                                  **DECISION AND ORDER**

JAMES T. CONWAY, Superintendent,
Attica Correctional Facility,

                         Respondent.

_____

I.      **BACKGROUND**

        *Pro se* petitioner Steven Barney ("Barney" or "petitioner") has filed a petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254. Barney originally was charged on September 25,

1998, in Erie County in a two-count indictment with second degree (intentional) murder and third

degree criminal possession of a weapon based upon allegations that he stabbed Ronald Hardy to

death with a knife in the entrance area of an apartment complex in the City of Buffalo. At trial

which, commenced on February 8, 1999, and concluded on February 26, 1999, trial counsel for

Barney presented a theory of justification (self-defense). The jury agreed, acquitting Barney of

the murder charge. However, the jury found Barney guilty of the weapons-possession charge, a

class D felony. Following a predicate felony hearing under New York Criminal Procedure Law

("C.P.L.") 400.20, the trial court adjudicated Barney as a persistent felony offender and imposed

an indeterminate sentence of 15 years to life.

        While the instant habeas petition was pending in this Court, Barney filed a pleading in

Erie County Court denominated as a "Motion Pusuant [sic] to C.P.L. Section 440.30 [sic][1] to Set Aside Sentence and to Vacate Judgment." Barney stated that his motion was based upon the following grounds: (1) "[b]y virtue of the jury acquitting the defendant of Intentional Murder, finding that the defendant was JUSTIFIED, the remaining count of Criminal Possession of a Weapon in the 3rd Degree, 265.01(2), under the People's theory to the Grand Jury and embodied in the Bill of Particulars, was JURISDICTIONALLY DEFECTIVE", and (2) "Improper and Prejudicial conduct on the part of the trial court and sentencing court not appearing on the record operated to deny the defendant his Constitutional Right to a fair trial, when" (a) the "Trial court communicated Ex Parte with the Prosecution and the District Attorney, without informing the defense of such communication"; (b) the trial court "unfairly predetermined the defendant to be a Persistent Felony Offender, prior to the start of the hearing designed to make such a determination"; (c) the trial court "unfairly used the charge the jury acquitted the defendant of, in it's [sic] determination to sentence the defendant to 15 years to life for the Criminal Possession of a Weapon in the 3rd Degree count"; and (d) the "Very Fact that the determination made by the court to determine that the defendant was a Persistent Felony Offender was in violation of the defendant's US Constitutional Right to Due Process." *See* Petitioner's Notice of C.P.L. §§ 440.10/440.20 Motion at pp. 1-2; *see also* Petitioner's Memorandum of Law in Support of C.P.L. §§ 440.10/440.20 Motion at pp. 16-19.

Barney's supporting affidavit reiterated his claim of self-defense. He also stated that

---

[1] C.P.L. § 440.30 sets out the circumstances under which the motion court may deny, without a hearing, a motion to vacate the judgment (made pursuant to C.P.L. § 440.10) or set aside the sentence (made pursuant to C.P.L. § 440.20). The substance of Barney's pleading makes clear that the reference to § 440.30 was a simple error, and his motion was brought under C.P.L. § 440.10 and C.P.L. § 440.20.

when his appellate counsel sent him a copy of the appellate brief submitted on his behalf, he learned for the first time that "a juror named Judy Owen wrote Pat Carrington, the Prosecutor . . .a letter . . . and that the letter was sent to the judge . . . back in March 1999, right after [he] was convicted of the Weapon charge." Petitioner's Affidavit at p. 4.[2] He discovered at that time that "the judge wrote Frank Clark, the Erie County District Attorney and spoke about [his] case and How [he] won the Battle but lost the War." Id.

At the same time he filed his motion to vacate in July 2005, Barney also submitted a memorandum of law in support of a motion to have the judge recuse herself. *See* Petitioner's Memorandum in Support of Motion for Recusal dated July 17, 2005.

The prosecution filed an Opposing Affidavit noting that Barney was seeking recusal of the sentencing judge from ruling on his motion and vacatur of his conviction and sentence on the grounds that (1) his conviction of third degree criminal possession of a weapon is repugnant to his acquittal of second degree (intentional) murder; (2) that the trial court pre-determined his status as a persistent felony offender prior to conducting a hearing; and (3) he was improperly sentenced as a persistent felony offender in light of *Blakey v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (June 24, 2004), *reh'g denied*, 542 U.S. 961, 125 S. Ct. 21 (Aug, 23, 2004). *See*

---

[2]     The juror, Judy Owen, stated in her letter addressed to Assistant District Attorney Patricia Carrington, Esq. ("A.D.A. Carrington"), as follows:

> I was on the Steven Barney jury last week and would like to express my concerns regarding his sentencing. While there were many of us who determined that he had committed this crime it was very difficult to get all 12 jurors to agree. It was extremely frustrating to me. I felt you did a great job in proving your case and would like to thank you for your efforts. If Mr. Barney's previous convictions had been known to us it may have made a difference in the verdict. I encourage you to seek the longest sentence allowable by law."

March 1, 1999 Letter from Juror Owen to A.D.A. Carrington, attached as Exhibit A to Petitioner's C.P.L. § 440.10/440.20 Motion.

People's Opposing Affidavit, at p. 2, ¶6.

Judge DiTullio issued a written decision and order denying the C.P.L. §§ 440.10/440.20 Motion and the Motion for Recusal on August 11, 2005. The Appellate Division denied leave to appeal.

## II. APPLICABLE LEGAL PRINCIPLES

### A.     Law Governing Petitions for Habeas Corpus Under 28 U.S.C. § 2254

Federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Errors of state law are not subject to federal habeas review. *See*, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, to be entitled to habeas relief, a petitioner must demonstrate that his conviction resulted from a state court decision that violated federal law. *Id.* at 68.

A petition for writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), the state court must base its decision on "the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir.2001). It is not necessary for the state court to refer to the federal aspect of a claim or to any federal law for the deferential standard to apply. *Id.* at 312. A

-4-

state court determination of a factual issue is "presumed to be correct" and the petitioner bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. at 405-06. *Williams* also held that habeas relief is available under the "unreasonable application" clause "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409.

## III. DISCUSSION

### A. Racial Discrimination By the Prosecutor During Jury Selection

Barney argues that the prosecutor's use of a peremptory challenge to strike Gloria Eccles, an African-American juror, violated *Batson v. Kentucky*, 476 U.S. 79 (1986). In *Batson v. Kentucky*, 476 U.S. 79 (1986), recognizing that "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure," the Supreme Court held that the guarantees of the Equal Protection Clause apply to the exercise of peremptory strikes. 476 U.S. at 89. Therefore, a state prosecutor may not "challenge

potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* ; *accord*, *Purkett v. Elem*; 514 U.S. at 767; *Hernandez v. New York*, 500 U.S. 352, 355, 358 (1991). Borrowing from the burden-shifting model used in its other discrimination jurisprudence, the Supreme Court in *Batson* outlined a three-step process for determining whether a party has used its challenges in an unconstitutionally discriminatory manner. *See* 476 U.S. at 93-94 & n.18 (citing, *inter alia United States Postal Serv. Bd. of Gov. v. Aikens*, 460 U.S. 711 (1983)); *accord Purkett*.

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (citing *Batson*, 476 U.S. at 96-98). In other words, once a party opposing a *Batson* motion responds by explaining the reason for the peremptory strike, the trial court must then determine whether it was motivated by race or some other improper factor. *See Purkett v. Elem*, 514 U.S. at 767 (*per curiam*) ("If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination."); *Jordan v. Lefevre*, 206 F.3d at 200 (granting habeas relief, pre-AEDPA, based on step-three *Batson* violation where trial judge failed to determine credibility of prosecutor's race-neutral explanations and ultimate issue of discrimination); *Aikens*, 460 U.S. at 714-15; *Batson*, 476 U.S. at 98; *United States v. Brooks*, 2 F.3d 838, 840-41 (8th Cir. 1993) ("Even if [the defendant] did

not make a *prima facie* showing, his conviction must be overturned if the Government offered an explanation that is not race neutral or acted with discriminatory intent.").

In order to establish a *prima facie* case of purposeful discrimination in selection of the petit jury: The movant must "raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96; *see also Johnson v. California*, 545 U.S. 162 (2005) ("[T]he defendant must make out a *prima facie* case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' ") (quoting *Batson*, 476 U.S. at 93-94, 106 S.Ct. 1712). A trial court "should consider all relevant circumstances" which might give rise to an inference of discrimination. *Batson*, 476 U.S. at 96-97.  The two factors noted by the Supreme Court likely to be of special significance were  "a 'pattern' of strikes against black jurors included in the particular venire," *Batson*, 476 U.S. at 96-97, and "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id.*

Once the movant has established a *prima facie* case of race-based discrimination, the burden of production shifts to the non-movant to articulate an explanation for the strike that is, on its face, not racially discriminatory. *Batson v. Kentucky*, 476 U.S. at 97-98; *see also Hernandez v. New York*, 500 U.S. at 358-59. Notably, at *Batson*'s step-two stage, the prosecution's only burden is to put forward a race-neutral explanation. "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97; *see also Hernandez v. New York*, 500 U.S. 352, 362-63 (1991) ("While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for

cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral

character.') (citation omitted). The party opposing the *Batson* motion has a "very low" burden at

step two, for "although a race-neutral reason must be given, it need not be 'persuasive or even

plausible.'" *Harris v. Kuhlmann*, 346 F.3d 300, 343 (2d Cir. 2003) (quoting *Purkett v. Elem*, 514

U.S. 758, 768 (1995)). At the second step of the *Batson* inquiry, "the issue is the facial validity of

the prosecutor's explanation[,]" and "[u]nless a discriminatory intent is inherent in the

prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S.,

at 360 (plurality opinion); *id.*, at 374 (O'Connor, J., concurring in judgment); *accord Purkett*,

514 U.S. at 768. In *Purkett v. Elem*, 514 U.S. 765 (1995), the Supreme Court explained the

distinction between the second and third steps of the *Batson* inquiry as follows:  At step two, the

prosecutor may provide any "legitimate reason" for exercising a particular peremptory strike that

on its face "does not deny equal protection." *Id.* at 769. The prosecutor's stated reason at this step

need not be persuasive or even plausible. *Id.* at 768; *see also Hernandez*, 500 U.S. at 360. In

contrast, *Batson*'s third step focuses on the persuasiveness of the prosecution's proffered

explanation for the challenge which  "'largely will turn on [an] evaluation of [the prosecutor's]

credibility'" by the trial judge.  *Hernandez*, 500 U.S. at 365 (quoting *Batson*, 476 U.S. at 98 n.

21); *accord Purkett*, 514 U.S. at 768 ("At th[e] [third] stage, implausible or fantastic

justifications may (and probably will) be found to be pretexts for purposeful discrimination.").

On direct appeal, the Appellate Division adjudicated petitioner's *Batson* claim on the

merits as follows:

> [The] County Court properly denied defendant's *Batson* challenge with respect to
> a black female prospective juror. That prospective juror stated that her son had
> been convicted 12 years earlier and that she had strong feelings about the outcome

> of the trial and the way in which it was handled. The prosecutor explained that she was exercising a peremptory challenge with respect to that prospective juror because, even though the prospective juror stated that she could be impartial, the prosecutor did not believe her because of her strong feelings about her son's conviction. The court properly determined that the prosecutor's explanation was race-neutral and not pretextual. The court was in the best position to observe the demeanor of the prospective juror and the prosecutor, and its determination is entitled to great deference.

*People v. Barney*, 295 A.D.2d 1001, 1001, 743 N.Y.S.2d 793, 794 (N.Y. App. Div. 4th Dept. 2002) (internal citations omitted). After reviewing the record in light of the above-discussed precedent, the Appellate Division reasonably applied the Supreme Court's clearly established precedent in affirming Barney's conviction with respect to his *Batson* claim. *Batson*'s step one is not at issue here, since Supreme Court has held that the *prima facie* case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it did in the present case. *See Hernandez v. New York*, 500 U.S. 352, 59 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot."); *accord Jordan v. LeFevre*, 206 F.3d 196, 200 (2d Cir. 2000) (stating that a trial judge may rule on a *Batson* application even in the absence of a *prima facie* showing of discrimination"); *Sorto v. Herbert*, 364 F. Supp.2d 240, 252 (E.D.N.Y. 2004), *aff'd*, 497 F.3d 163 (2d Cir. 2007).

As required under step two, the trial court sought race-neutral reasons for the prosecutor's peremptory challenge to the juror in question. Although the prosecutor must present a comprehensible reason, [t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices.

*Purkett v. Elem*, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*) (quoted in *Rice v. Collins*, 546 U.S. 333, 338 (2006)).  Here, the reasons proffered by the assistant district attorney were facially neutral and supported by the juror's own statements in open court that her son had been convicted 12 years earlier and that she had strong feelings about the outcome of the trial and the way in which it was handled. Thus, Appellate Division's determination of the facts on this point were not unreasonable in light of the evidence presented. The prosecutor met the low burden called for at *Batson*'s stage two.

The Court now turns to the third step, under which the trial judge "must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, [476 U.S.], at 98, 106 S.Ct. 1712 (quoted in *Rice v. Collins*, 546 U.S. at 338). As the Supreme Court has instructed:

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike. At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Ibid.* In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.

*Miller-El v. Cockrell*, 123 S.Ct. at 1040.  *Batson*'s "final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 768)).

The trial judge at Barney's trial credited the prosecutor's proffered race-neutral reason. Under the circumstances here, the state courts were not unreasonable in determining that the prosecutor was credible and the reason for the peremptory strike not pretextual.  "Credibility can

be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El*, 123 S. Ct. at 1040. The Supreme Court and the Second Circuit have explained that habeas courts are not to lightly overturn a state court judge's credibility determinations in *Batson* challenges. *McKinney v. Artuz*, 326 F.3d at 98 ("[E]valuation of the [striking attorney's] state of mind based on [his or her] demeanor and credibility lies peculiarly within a trial judge's province.") (internal quotations and citations omitted, brackets in original); *Miller-El v. Cockrell*, 123 S.Ct. at 1041 ("Deference is necessary because a reviewing court, which analyzes only the transcript from *voir dire*, is not as well positioned as the trial court is to make credibility determinations."). Here, petitioner has not demonstrated to the Court any circumstances apparent on the record to demonstrate that the prosecutor's demeanor was such as to suggest racial bias.

Looking at the reasonableness (or, stated another way, the improbability of the explanation), I note that the offered reason was based upon the juror's affirmative statements on the record and is not implausible. *See Jordan v. Lefevre,* 206 F.3d at 200 (recognizing "negative experience with law enforcement, age, life experience, type of employment, and demeanor" as acceptable race neutral reasons for challenging prospective jurors).[3] Petitioner has not provided

---

[3] *See also Green v. Travis*, 414 F.3d at 300-01 (2d Cir.2005) (accepting as a satisfactory race-neutral reason for peremptory strike the prosecutor's explanation that the prospective jurors had relatives who had been convicted of drug offenses; stating that such a reason "relied on the types of evidence that this Court has approved in support of establishing the racial neutrality of a peremptory challenge"; "A family member's criminal history has been found to constitute a race-neutral factor for a peremptory challenge of a prospective juror." *Owens v. Portuondo*, No. 98 CIV. 6559(AJP), 1999 WL 378343, at *10 (S.D.N.Y. June 9, 1999) (citing, *inter alia*, *United States v. Lawal*, No. 97-1026, 129 F.3d 114 (table), 1997 WL 664794 at *1 (2d Cir. Oct.21, 1997) (stating that challenges "on the basis of family criminal histories . . . are well-accepted, facially race-neutral reasons"); *Jordan v. Lefevre*, 22 F. Supp.2d at 272; *United States v. Franklin*, No. S1 96 Cr. 1062, 1997 WL 334969 at *5-6 (S.D.N.Y.1997), aff'd, 157 F.3d 90 (2d Cir.1998)).

any evidence to contradict that the prospective juror stated that her son had been convicted of a crime some 12 years previously and that she had strong feelings about how the case was disposed. In addition, petitioner has not argued, nor has he shown that there was less than complete uniformity in application of this particular factor to non-minority prospective jurors. *See United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir. 1991) ("The force of a prosecutor's explanation for challenging a minority member of a venire is obviously weakened substantially by evidence that non-minority members to whom the same explanation applies were not challenged."). In an attempt to rebut the finding of no racial discrimination, petitioner's only argument is that the prosecutor's reason was pretextual because the prospective juror asserted that notwithstanding her negative experience with the criminal justice system, she could be an impartial juror. The assessment of a prospective juror's demeanor, like the assessment of the demeanor of the party making the peremptory strike, is a proper consideration in the *Batson* context. *Thaler v. Haynes*, 130 S.Ct. 1171, 1174 (2010). (" *Batson* noted the need for a judge ruling on an objection to a peremptory challenge to "tak[e] into account all possible explanatory factors in the particular case," 476 U.S., at 95, 106 S.Ct. 1712 (internal quotation marks omitted in original)); *see also McCrory v. Henderson*, 82 F.3d 1243, 1248 (2d Cir. 1996). This determination generally is a matter of the trial court's discretion, and its finding is entitled to deference on appellate and habeas review. *Batson*, 476 U.S. at 98 n. 21. It was not unreasonable for the Appellate Division to conclude that the trial court was in the best position to assess the prospective juror's credibility. Given that petitioner has not come forward with any other *indicia* of pretext on the part of the prosecutor, this Court has no basis upon which to conclude that the trial court's factual determinations regarding the prospective juror's demeanor and the

prosecutor's credibility were unreasonable.

### B.     Failure of the Prosecution to Fulfill Due Process Disclosure Obligations

Georgette Snyder, an eyewitness to the altercation between petitioner and the decedent,
testified on direct examination that when the police initially approached her, she told them she
"hadn't seen anything." However, when they returned and informed her that the victim was not
going to survive the knifing, she began crying and told them what she had observed of the
struggle. T.90. After Snyder's testimony that she initially told the police she had not witnessed
the crime, Barney's attorney objected, arguing that this was exculpatory evidence which not been
disclosed to the defense prior to trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).
T.98. In opposition to defense counsel's motion for a mistrial, the prosecutor stated that Snyder
did not testify that she told the police she was unable to identify the perpetrator, but rather said
that she had not seen anything because she did not want to get involved.  The trial court denied
the mistrial motion. The trial court's remedy was to allow defense counsel extra time to prepare
for his cross-examination of Snyder. T.97-100. On cross-examination, Snyder again testified that
when the police inquired whether she knew what had happened, she said that she did not know
anything because she did not want to be involved. T.185-86.

On direct appeal, the Appellate Division rejected Barney's contention that there was a
violation of *Brady* in connection with Snyder's testimony:

> With respect to the alleged *Brady* violation, reversal is not required because
> defense counsel knew about the allegedly exculpatory evidence during trial and
> was given a meaningful opportunity to use it.

*People v. Barney*, 295 A.D.2d at 1001, 743 N.Y.S.2d at 794 (citing, *inter alia*, *People v. Cortijo*,
70 N.Y.2d 868, 870, 523 N.Y.S.2d 463, 517 N.E.2d 1349 (N.Y. 1987)).  In *People v. Cortijo*, the

-13-

defendant discovered the existence of two eyewitnesses during the prosecution's case-in-chief. After reviewing a statement made by one eyewitness, defense counsel declined the trial court's offer to reopen the proofs and to have the prosecution's witnesses recalled for additional cross-examination based on the newly disclosed witness statement. *Cortijo*, 70 N.Y.2d at 464. The New York Court of Appeals refused to decide whether the witness statement was *Brady* material. *Id.* Rather, it noted that it had previously held that "'[w]hile the People unquestionably have a duty to disclose exculpatory material in their control,' a defendant's constitutional right to a fair trial is not violated when, as here, he is given a meaningful opportunity to use the allegedly exculpatory material to cross-examine the People's witnesses or as evidence during his case." *Id.* at 464 (citing *People v. Brown*, 67 N.Y.2d 555, 505 N.Y.S.2d 574, 575, 496 N.E.2d 663 (N.Y. 1986) ( "Assuming the disputed information is *Brady* material, we conclude that defendant is entitled neither to a new trial nor to reopen the [suppression] hearing. . . . Defendant cannot claim that he was deprived of due process when he had the opportunity during the bench trial to cross-examine the identifying witness using the allegedly exculpatory evidence."). As the New York Court of Appeals did in *People v. Cortijo*, the state appellate court in Barney's case apparently assumed without deciding that the testimony of Snyder was *Brady* material but found that there was no due process violation essentially because the evidence was not of the type that its disclosure was required prior to trial; in other words, "material" impeachment evidence was not "suppressed" in the *Brady* sense.

"*Brady* material that is not 'disclos[ed] in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the *Brady* doctrine.'" *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (quoting *Leka v. Portuondo*, 257

F.3d at 103). The Second Circuit has explained that "materiality" and the timing of a disclosure required by *Brady* are linked; they are both "dependent upon the anticipated remedy for a violation of the obligation to disclose: the prosecutor must disclose 'material' (in the *Agurs/Bagley* sense) exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *See United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001) (citing *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir.2001) ("It is not feasible or desirable to specify the extent or timing of [the] disclosure *Brady* and its progeny require, except in terms of the sufficiency, *under the circumstances*, of the defense's opportunity to use the evidence when disclosure is made." (emphasis added in *Coppa*)).     In this Court's opinion, the fact that Snyder had initially denied knowing anything about the crime certainly is important impeachment evidence regarding a key prosecution witness. Nevertheless, the Appellate Division's reliance upon *People v. Cortijo* to hold that under the *circumstances presented here*, there was no due process violation, was neither contrary to, nor constituted an unreasonable application of, clearly established Federal law.  Here, the prosecutor did not "disclose" the witness' first statement to police denying knowledge about the incident; rather, its existence simply was revealed during the course of the witness' trial testimony. However, in light of the Second Circuit's cases interpreting *Brady*, the Court cannot conclude that state court unreasonably applied Federal law in essentially concluding the evidence was not "suppressed" for purposes of establishing a *Brady* violation since defense counsel was able to use the evidence to try to impeach Snyder on cross-examination. *See Coppa*, 267 F.3d at 144 ("[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law

simply because it did not produce the evidence sooner. There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial. . . ." ) (quoted in *Douglas*, 525 F.3d at 245)).

### C. Conviction for Criminal Possession of a Weapon Against the Weight of the Credible Evidence

Barney contends the verdict convicting him of criminal possession of a weapon in the third degree under N.Y. Penal Law § 265.01(2)–that is, possessing a dangerous weapon (here, a steak knife) with intent to use it unlawfully against another person–is against the weight of the credible evidence. Barney points out that the jury accepted his defense of justification with regard to the murder charge, and argues that the various eyewitnesses' testimony presented credibility problems. As respondent points out, justification is not a defense to criminal possession of a weapon because the " intent to use and use of force are not the same, and justification, by the very words of the statute (Penal Law § 35.15), is limited to the latter." *Peole v. Pons*, 68 N.Y.2d 264, 267 (N.Y. 1986) ("We hold, therefore, that because possession of a weapon does not involve the use of physical force, there are no circumstances when justification (Penal Law § 35.15) can be a defense to the crime of criminal possession of a weapon.") (internal citation omitted).  The jury was instructed, however, that a defendant's temporary possession of a dangerous weapon for a lawful purpose is not punishable as a crime. T.1031. On direct appeal, the Appellate Division summarily ruled that Barney's weapons-possession conviction was "not against the weight of the evidence." *People v. Barney,* 295 A.D.2d  at 1001 (citing *People v. Bleakley*,  69 N.Y.2d 490, 495 (N.Y. 1987)).

As an initial matter, a defendant's claim that his conviction is against the weight of the

credible evidence does not present a federal constitutional issue cognizable on habeas review. *See*, *e.g.*, *Robinson v. Scully*, 683 F. Supp. 941, 943 (S.D.N.Y. 1988) ("A claim that the verdict was against the weight of the evidence does not raise an issue of constitutional dimensions unless the record is so totally devoid of evidentiary support that a due process issue is raised.") (citing *Mapp v. Warden*, 531 F.2d 1167, 1173-74 n. 8 (2d Cir.), *cert. denied*, 429 U.S. 982 (1976); *United States ex rel. Terry v. Henderson*, 462 F.2d 1125, 1131 (2d Cir. 1972)). A "weight of the evidence" claim derives from C.P.L.") § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5). Thus, an argument that a verdict is against the weight of the evidence is a pure state law claim grounded in the criminal procedure statute, whereas a claim that the verdict is legally insufficient is based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d at 495; *see also Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. at 68; *see also* 28 U.S.C. § 2254(a). Since a "weight of the evidence claim" is purely a matter of state law, it is not cognizable on habeas review. *Accord*, *e.g.*, *Ex parte Craig*, 282 F. 138, 148 (2d Cir.1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923); *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (dismissing claim that conviction was against the weight of the evidence; such a claim is not a basis for habeas relief but presents only an error of state law, for which habeas review is not available); *Douglas v. Portuondo*, 232 F. Supp.2d 106, 116 (S.D.N.Y.2002) (same). Accordingly, Barney's "weight of

the evidence" claim is dismissed as it does not raise a federal claim cognizable on habeas review.

### D. Judicial bias and misconduct on the part of the sentencing court

"The Supreme Court has established that due process "requires a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) and citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-22 (1986), and *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). "[T]o perform its high function in the best way 'justice must satisfy the appearance of justice' [ . . . ]" *Schweiker v. McClure*, 456 U.S. 188, 196 (1982) (citations omitted). *Cf. J.E.B. v. Alabama*, 511 U.S. 127, 161 n. 3 (1994) (Scalia, J., dissenting) ("Wise observers have long understood that the appearance of justice is as important as its reality."). "The entitlement to an impartial tribunal applies to the sentencing phase of a criminal proceeding as well as to the guilt phase." *Robertson v. California*, 498 U.S. 1004, 1005 (1990) (Blackmun, J., dissenting from denial of *certiorari*) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 518 (1968) ("It has not been shown that this jury was biased with respect to the petitioner's guilt. But it is self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments.") (citing *Glasser v. United States*, 315 U.S. 60, 84-86; *Irvin v. Dowd*, 366 U.S. 717, 722-23; *Turner v. State of Louisiana*, 379 U.S. 466, 471-73).

"[A] biased tribunal always deprives the accused of a substantial right." *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); *Gomez v. United States*, 490 U.S. 858, 876, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (same). The Supreme Court has held that trial before a biased judge is an error that is "'structural,' and thus subject to automatic reversal .

. . ." *Neder v. United States*, 527 U.S. 1, 8 (1999) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)); *see also Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (observing that it had found "lack of an impartial trial judge" to be a structural error) (citing *Tumey*, 237 U.S. at 523). "A favorable or unfavorable predisposition can . . . deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994) (citations omitted).

Furthermore, the Supreme Court "has recognized 'presumptive bias' as the one type of judicial bias other than actual bias that requires recusal under the Due Process Clause." *Richardson v. Quarterman*, 537 F.3d 466, 475 (5th Cir. 2008) (citing *Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008). Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that "the probability of actual bias . . . is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)).

To prevail on a claim of judicial bias, habeas petitioner must demonstrate that he did not receive a trial "by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing." *Ungar v. Sarafite*, 376 U.S. 575, 584 (1964). "Mere allegations of judicial bias or prejudice do not state a due process violation." *Brown v. Doe*, 2 F.3d 1236, 1248 (2d Cir.1993), *cert. denied*, 510 U.S. 1125 (1994).

Here, Barney has come forward with clear and uncontroverted documentary proof that Judge DiTullio harbored an actual bias against him and predetermined the outcome of the persistent felony offender hearing. At least a month before the prosecutor actually requested a

persistent felony hearing, Judge DiTullio sent the following memorandum to the District

Attorney of Erie County, which enclosed a letter she had received from juror named Judy Owen,

who apparently was disgruntled about the verdict acquitting Barney of murder. The note was

dated "3/3/99," the day after the verdict, read in full as follows:

> Dear Frank [Clark],
> Please find a copy of a letter I received from a juror in a recent murder
> trial. [Prosecutor] Pat Carrington tried the case and did a terrific job – despite the
> disappointing verdict.
> Since you are Pat's boss – I thought it appropriate that you see this letter.
> Finally, this jury did convict on the D/F [sic] weapon and this defendant is
> a persistent felony offender – appears as if the defendant won the battle but lost
> the war.
>> Sincerely,
>> Sheila DiTullio[, Erie County Court Judge]

It does not appear that trial counsel had access to the note at any time prior to sentencing. It is not

clear how this came to the attention of Barney's appellate counsel, who quoted it verbatim in the

appellate brief argued that it demonstrated judicial bias on direct appeal.  The memorandum is so

starkly prejudicial that the District Attorney's Office did not address it in opposition to the

appeal. Furthermore, the Appellate Division inexplicably did not specifically mention the

memorandum or in any way allude to this improper *ex parte* communication evidencing obvious

prejudice on the part of the sentencing court.

That the hearing was merely a pretense is further demonstrated by the fact that after

hearing several days of testimony, the trial court issued a conclusory ruling without specifying

the court's reasoning or the evidence upon which the court relied:

> As a result of the hearing, the Court finds that the Defendant is a persistent felony
> offender as defined in 70.10-1 [sic] of the Penal Law. I base that finding on all the
> proof presented at the 400.20 hearing concerning the Defendant's criminal record
> and the history and character of the Defendant. That proof involved proof from the

prosecution as well as the defense.

Transcript of August 18, 1999 Persistent Felony Offender Hearing ("8/18/99 Tr.") at 37. Furthermore, the evidence presented at the persistent felony offender hearing hardly compelled the conclusion that Barney was the type of incorrigible, recidivist violent offender deserving of extended incarceration and lifetime supervision under New York's harshest sentencing. For instance, Petitioner's daughter testified that she had been in continuous contact with her father throughout her whole life, even while he was incarcerated; that Petitioner had always supported her, including by providing financial assistance; and that she never knew her father to abuse alcohol, use drugs, or be violent. 8/18/99 Tr. at 5-10. Petitioner testified that he had been released on parole with regard to the 1986 rape conviction, and had been released early from parole , after which he sought and obtained employment. 8/18/99 Tr. at 19-20. Petitioner testified that he had family in Las Vegas, Nevada; his nephew, Kemp Strickland, was a prosecutor there. His nephew had said he "would guarantee [Barney] employment" so he "could start [his] life over out there." 8/18/99 Tr. at 20-21. Petitioner also testified regarding the circumstances underlying a previous conviction in the 1970s by guilty plea for attempted robbery, and explained that he was an unwitting participant in the incident, and that he received the minimum sentence possible. *Id.* at 21-27.

In sum, Barney has amply fulfilled his burden of demonstrating that Judge DiTullio clearly was not unbiased and impartial, and that his due process rights were violated by her having presided over his sentencing hearing.

      **E.**     **Petitioner's sentence under the persistent felony offender statute violated his Sixth Amendment right to a jury trial**

### 1. Overview

The Sixth and Fourteenth Amendments guarantee that in federal and state "criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI; *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (holding that the Due Process Clause of the Fourteenth Amendment affords defendants the right to a jury trial in state prosecutions to the same extent the Sixth Amendment affords this right in federal prosecutions). "The Supreme Court has concluded that this guarantee requires that a jury, not a judge, find any facts (other than the fact of a prior conviction(s)) that may increase the penalty for a crime beyond the ordinary statutory maximum." *Besser*, 601 F.3d at 180 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)); *accord Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004); *Booker v. United States*, 125 S. Ct. 738 (2005); *Cunningham v. California*, 549 U.S. 270 (2007)).  Barney challenges his enhanced sentence imposed pursuant to New York's discretionary persistent felony offender statute, N.Y. PENAL LAW § 70.10, on the basis that it required the type of judicial fact-finding held impermissible under *Apprendi* and its progeny. Specifically, Barney contends, the enhanced sentence violated his Sixth Amendment rights because it was based on facts not submitted to the jury and not proven beyond a reasonable doubt, in violation of his Sixth Amendment right to a jury trial.

### 2. New York's Persistent Felony Offender Statutes

New York has two sentence-enhancing statutes for persistent felony offenders. One is the persistent violent felony offender provision in N.Y. Penal Law § 70.08. That statute applies to defendants who stand convicted of a violent felony (as defined in N.Y. Penal Law § 70.02) and

have previously been convicted of two or more predicate violent felonies (as defined in N.Y. Penal Law § 70.04(1)(b)). *See People v. Rivera*, 3 N.Y.3d 61, 73 n.3 (N.Y. 2005) (Kaye, Ch. J., dissenting). Such defendants receive an indeterminate sentence of imprisonment, the maximum of which must be life. *See Rivera*, 3 N.Y.3d at 73 (Kaye, Ch. J., dissenting) ("The persistent felony offender statute . . . stands in stark contrast to Penal Law § 70.08, which requires that all three-time violent felons be sentenced to an indeterminate life term on the basis of the prior convictions alone."). Minimum terms are prescribed by the statute as well and vary depending on the grade of the offense of conviction. Under the provisions applicable to persistent violent felony offenders, the existence or non-existence of a prior felony alone determines the applicable range. *Compare* N.Y. PENAL LAW §§ 70.08 *with* 70.10. Section 70.08 of the Penal Law "defines a 'persistent violent felony offender' as "a person who stands convicted of a violent felony offense as defined in subdivision one of section 70.02 after having previously been subjected to two or more predicate violent felony convictions" (Penal Law § 70.08(1)(a))." *People v. Green*, 68 N.Y.2d 151, 152 (N.Y. 1986). Because N.Y. Penal Law § 70.08 requires the sentencing court to make no factual finding other than the fact of the existence of two or more predicate violent felony convictions, courts have rejected challenges to its constitutionality under the 6th and 14th Amendments because it falls squarely within the exception carved out by *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), and *Apprendi* for sentence enhancements based solely on prior convictions. *E.g., Quan v. Potter*, No. 06 CV 4841(JG), 2007 WL 3223217, *7 (E.D.N.Y. Oct. 29, 2007) ("However, an enhancement based on § 70.08 relies solely upon the court's finding of the qualifying prior convictions. The enhancement thus falls within the exception to the *Apprendi* rule. Unlike § 70. 10, the discretionary persistent felony offender statute which

raises Sixth Amendment concerns, § 70.08, the mandatory persistent felony offender statute does

not implicate Quan's Sixth Amendment right to a jury determination.") (internal citations

omitted). The Second Circuit has not specifically addressed the validity of § 70.08, but pointed

out in *Besser* that it was not addressing § 70.08. *Besser v. Walsh*, 601 F.3d at 170 n.5.[4] *See, e.g.*,

*Antinuche v. Zon*, No. 1:05-cv-01246-ENV, 2010 WL 2035795, at *11 n.6 (E.D.N.Y. May 20,

2010).

A persistent violent felony offender must be sentenced to an indeterminate sentence

having a maximum term of life imprisonment (Penal Law § 70.08 (2)), with different minimum

terms being set based upon the class of felony for which the defendant has been convicted.[5] *See*

N.Y. PENAL LAW § 70.08(3). Under P.L. § 70.08, "the court must impose" an enhanced penalty

once it finds that a defendant has sustained the requisite number and type of predicate felony

convictions, *id.* at § 70.08(2). Practitioners of criminal law in New York often refer to P.L. §

70.08 as the "mandatory" persistent felon statute; hence, their use of the shorthand "mandatory"

to describe that form of sentence enhancement.

---

[4] With the issuance of *Apprendi*, the continued vitality of *Almendarez-Torres* became an open question. Although the *Apprendi* court criticized *Almendarez-Torres*, *see Apprendi*, 530 U.S. at 489-90 (noting that it was "arguable that *Almendarez-Torres* was incorrectly decided"), it also explicitly created an exception to the Sixth Amendment rule which preserved *Almenarez-Torres*' essential holding. *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction," "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Since then, the Supreme Court has never overturned, and has repeatedly reaffirmed, the prior-conviction exception, in reliance upon the *Almendarez-Torres* holding that a prior conviction is not an element of the offense which required fact-finding by a jury in order to fulfill the Sixth Amendment's jury requirement. *See James v. United States*, __ U.S. ___, 127 S. Ct 1586, 1600 n. 8 (2007); *Cunningham v. California*, 127 S. Ct at 868; *Blakely v. Washington*, 542 U.S. at 301; *Ring v. Arizona*, 536 U.S. at 597 n. 4.

[5] For the class A-II felony of predatory sexual assault as defined in section 130.95 of this chapter or the class A-II felony of predatory sexual assault against a child as defined in section 130.96 of this chapter, the minimum period must be twenty-five years. For a class B felony, the minimum period must be at least twenty years and must not exceed twenty-five years. For a class C felony, the minimum period must be at least sixteen years and must not exceed twenty-five years. For a class D felony, the minimum period must be at least twelve years and must not exceed twenty-five years. N.Y. PENAL LAW § 70.08(3)(a), (a-1), (b), (c).

The second persistent felony offender statute is N.Y. Penal Law § 70.10. This statute is designed to provide enhanced punishment for recidivists who fail to qualify as mandatory persistent violent felony offenders under § 70.08. It characterizes as a "persistent felony offender" any defendant who stands convicted of a felony and has two prior felony convictions (whether or not they are for violent felonies) as defined in the statute. *See* N.Y. PENAL LAW § 70.10(1)(a)-(c). As an enhanced penalty for such offenders, P.L. § 70.10[6] provides that, in lieu of the sentence otherwise authorized by the penal law, persistent felony offenders "may" be sentenced as though the offense of conviction were a class A-1 felony. Id. (emphasis added).

---

[6]  New York's persistent felony offender ("PFO") statute reads as follows:

1. Definition of persistent felony offender.
> (a) A persistent felony offender is a person, other than a persistent violent felony offender as defined in section 70.08, who stands convicted of a felony after having previously been convicted of two or more felonies, as provided in paragraphs (b) and (c) of this subdivision.
> (b) A previous felony conviction within the meaning of paragraph (a) of this subdivision is a conviction of a felony in this state, or of a crime in any other jurisdiction, provided:
>> (i) that a sentence to a term of imprisonment in excess of one year, or a sentence to death, was imposed therefor; and
>> (ii) that the defendant was imprisoned under sentence for such conviction prior to the commission of the present felony; and
>> (iii) that the defendant was not pardoned on the ground of innocence; and
>> (iv) that such conviction was for a felony offense other than persistent sexual abuse, as defined in section 130.53 of this chapter.
> (c) For the purpose of determining whether a person has two or more previous felony convictions, two or more convictions of crimes that were committed prior to the time the defendant was imprisoned under sentence for any of such convictions shall be deemed to be only one conviction.

2. Authorized sentence. When the court has found, pursuant to the provisions of the criminal procedure law, that a person is a persistent felony offender, *and when it is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest, the court,* in lieu of imposing the sentence of imprisonment authorized by section 70.00, 70.02, 70.04, 70.06 or subdivision five of section 70.80 for the crime of which such person presently stands convicted, *may impose the sentence of imprisonment authorized by that section for a class A-I felony.* In such event the reasons for the court's opinion shall be set forth in the record.

N.Y. PENAL LAW § 70.10 (emphases supplied). C.P.L. § 400.20 is the statute setting for the procedure to be followed in adjudicating and sentencing a defendant as a persistent felony offender and is a critical part of the persistent felony offender sentencing scheme

Persistent felony offenders may be sentenced to an indeterminate sentence in the range authorized for Class A-I felony offenses, instead of the sentencing range authorized for the class of the defendant's actual offense (here, Class D). *See id.* § 70.10(2); *see also* N.Y. CRIM. PROC. LAW § 400.20(1)(b). Class A-I felonies carry a minimum period of 15 years and a maximum of life imprisonment. *See* N.Y. PENAL LAW §§ 70.00(2)(a), 70.00(3)(a)(i).[7]

In order to impose a persistent felony offender sentence under P.L. § 70.10, the state court also must make a finding of at least two prior felony convictions. Unlike the enhanced sentences prescribed by the persistent violent offender provision, which again are mandatory, the enhancement under P.L. § 70.10 does not necessarily follow once a defendant is found to have the requisite prior convictions. After the court finds the requisite number of predicate felony convictions, the defendant is "expos[ed] . . . to a Class A-I sentence." *Id.* (citing N.Y. PENAL LAW § 70.10). And the sentencing judge at that point may declare the defendant a persistent felony offender. More is required, however, in order to actually *impose* a Class A-I sentence under N.Y. Penal Law § 70.10:

> [A Class A-I] sentence *may not be imposed unless*, based upon *evidence in the record of a hearing* held pursuant to this section [i.e., N.Y. CRIM. PROC. LAW § 400.20(9)], the court (a) has found that the defendant is a persistent felony offender as defined in subdivision one of section 70.10 of the penal law, *and (b) is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct are such that extended incarceration and lifetime supervision of the defendant are warranted to best serve the public interest.*

---

[7]     In New York, "[b]ecause a defendant sentenced to an indeterminate sentence receives a sentence that is a range of years, rather than a set term, the New York statutes frequently refer to the 'maximum term' and the 'minimum period of imprisonment.'" *Besser*, 601 F.3d at 170 n.1 (quoting N.Y. PENAL LAW § 70.00(2)-(3)). The Second Circuit clarified that New York's terminology "should not be confused with th[e] [*Besser*] opinion's use of the terms 'maximum' and 'minimum,' which are used to refer to the outer boundaries of the sentence, rather than a specific range, that a defendant could permissibly receive." *Id.*

N.Y. Crim. Proc. Law § 400.20(1) (emphases supplied).

After the defendant is determined to be an eligible recidivist, the sentencing court must conduct a hearing to determine whether "it is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest." *Id*. at § 70.10(2); *see also* N.Y. Crim. Proc. Law § 400.20. Only if the court reaches that "opinion" and supports it with sufficient factual findings may the enhanced ( i.e., A-1 felony) punishment be imposed. This form of sentence enhancement is therefore referred to as the "discretionary" persistent felony offender punishment. In contrast to the persistent violent felony offender statute, § 70.08, which provides for different minimum terms based upon the class of felony for which the defendant is convicted, "[n]o gradation of penalty due to the class of felony committed has been provided for in the persistent felony offender statute, and in this sense the sentence authorized for a persistent felony offender (Penal Law, § 70.10, subd. 2) bears no relationship to the gravity of the underlying crime committed. The authorized sentence for a persistent felony offender does not depend on the class of felony committed." *Roballo v. Smith*, 99 A.D.2d 5, 8, 471 N.Y.S.2d 433, 435 (N.Y. App. Div. 4ᵗʰ Dept.), *aff'd*, 63 N.Y.2d 485 (N.Y. 1984).[8]

It is important to note that the sentencing judge, acting pursuant to P.L. § 70.10(2) in

---

[8]    For instance, in *People v. Stokes*, 290 A.D.2d 71, 75, 736 N.Y.S.2d 781, 784 (App. Div. 3d Dept. 2002), the Appellate Division noted the significant sentencing disparities between being sentenced as a first or second felony offender and as a persistent felony offender: "Notably, while the maximum prison sentence for an E felony is an indeterminate term of 1 1/3 to 4 years (*see*, [N.Y.] Penal Law § 70.00(2)(e); (3) (b)) and the maximum prison sentence for this particular E felony under the second felony offender statute–as specifically enhanced by the Legislature–is 2 1/2 to 5 years (*see*, [N.Y.] Penal Law § 70.06(3)(e); (4)(b)), the authorized sentence under the persistent felony offender statute upon a conviction for any felony (including this nonviolent E felony) is a maximum of life imprisonment and a minimum of not less than 15 years nor more than 25 years–the sentence range authorized for class A-1 felonies (*see*, [N.Y.] Penal Law § 70.10(2); § 70.00(2)(a); (3)(a)(i)).

conjunction with the dictates of C.P.L. § 400.20, need only find that the prosecution has established the "[m]atters pertaining to the defendant's history and character and the nature and circumstances of his criminal conduct" (sometimes referred to as the "'history/character/criminal conduct finding") by a "preponderance of the evidence." *Id.*, § 400.20(5); *accord Besser*, 601 F.3d at 171.

The Second Circuit in *Besser* explicitly rejected the State's argument, based upon statements by the New York Court of Appeals in *People v. Rivera*, 800 N.Y.S.2d 51, 833 N.E.2d 194, 198-99 (N.Y. 2005), that "a finding of two felony convictions alone locks in the Class A-I range, with life as a maximum." *Besser*, 601 F.3d at 172. Rather, the Second Circuit held, "[t]he history/character/criminal conduct findings, which are subject to appellate review, are *necessary* to lock in the Class A-I range and, if such findings do not justify a Class A-I sentence, require the sentencing court to sentence the defendant in a lesser range, usually as a second felony (or violent felony) offender." *Id.* (emphasis supplied).

In this case, Barney was found to warrant the severest level of recidivist sentencing, authorized under N.Y. Penal Law § 70.10, the "discretionary" persistent felony offender statute. Section 70.10 provides that a defendant who has been previously convicted of two felonies is a "persistent felony offender" (sometimes referred to as a "PFO"). *See* N.Y. PENAL LAW § 70.10(1)(a). Barney, as a PFO, was sentenced to 15 years for life for the class D felony conviction, third degree criminal possession of a weapon. The sentence imposed was the lowest possible under the PFO statute. However, the minimum (15 years) was three (3) years more than the minimum he could have received (12 years) had he been sentenced as a persistent violent felony offender under N.Y. Penal Law § 70.08.

### 3. Petitioner's Prior State Court Proceedings Concerning the *Apprendi*/*Blakely* Claim

As noted above, Barney was acquitted of second degree (intentional) murder but convicted by the jury of third degree criminal possession of a weapon, a Class D felony. The state moved to have Barney sentenced as a persistent felony offender, in the hopes of securing a Class A-I sentence. At the beginning of the hearing, the prosecutor observed that Barney could otherwise be sentenced as a persistent violent felony offender, *see* N.Y. PENAL LAW § 70.08, and defense counsel agreed. Barney did not deny his three prior violent felony convictions, nor did he raise any constitutional challenge to his prior convictions. Barney, however, did contest whether his criminal conduct, history, and character was of the kind warranting an enhanced sentence under P.L. § 70.10.

At the conclusion of the hearing, the trial court ruled from the bench as follows:

> As a result of the hearing, the Court finds that the Defendant is a persistent felony offender as defined in 70.10-1 [sic] of the Penal Law. I base that finding on all the proof presented at the 400.20 hearing concerning the Defendant's criminal record and the history and character of the Defendant. That proof involved proof from the prosecution as well as the defense.

Transcript of August 18, 1999 Persistent Felony Offender Hearing ("8/18/99 Tr.") at 37. That was the full extent of the sentencing court's decision. *But see Besser*, 601 F.3d at 171 ("If the sentencing court imposes a Class A-I sentence, '*the reasons for the court's opinion shall be set forth in the record*.'") (quoting N.Y. PENAL LAW § 70.10(2) (emphasis supplied)).

This claim was presented in Barney's C.P.L. § 440.10 motion, and the County Court dismissed the claim on the merits, citing *People v. Rosen*, 96 N.Y.2d 329, 335 (N.Y. 2001), in which the New York Court of Appeals held that "prior felony convictions are the sole

determinate [sic] of whether a defendant is subject to enhanced sentencing as a persistent felony offender." Although the sentencing "court *must* consider *other enumerated factors* to determine whether it 'is of the opinion that a persistent felony offender sentence is warranted,'" *id.* (quoting N.Y. CRIM. PROC. LAW § 400.20(9) (emphases supplied)), this amounts "only [to the court] fulfilling its traditional role–giving due consideration to agreed-upon factors–in determining an appropriate sentence within the permissible statutory range[,]" *id.* The Appellate Division denied leave to appeal. Although the form habeas petition filed by Barney did not explicitly raise the *Apprendi* issue with regard to his sentence, respondent's opposition addressed the *Apprendi* claim inasmuch as it was raised on direct appeal and in support of the motion to vacate the judgment pursuant to C.P.L. § 440.10. Given that *pro se* filings should be generously construed to raise the strongest arguments they suggest, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and the applicability of the liberal amendment policy reflected in FED. R. CIV. P. 15(a), *see, e.g.*, *Littlejohn v. Artuz*, 271 F.3d 360, 363-64 (2d Cir. 2001), as well as the fact that the respondent specifically addressed this claim in opposing Barney's direct appeal and C.P.L. § 440.10 motion, which specifically argued that the sentence was unconstitutional in light of the Supreme Court's clarification of *Apprendi*'s meaning in *Blakely v. Washington*, the Court will construe Barneys' petition as raising the *Apprendi* issue–along with his original claim regarding the fairness of his sentence.

### 4.    Petitioner's *Apprendi* Claim Was Adjudicated on the Merits

"AEDPA[9] deference applies only if a state court has disposed of a federal claim 'on the merits' and "reduce[d] its disposition to judgment.'" *Besser*, 601 F.3d at 179 (quoting *Sellan v.*

---

[9]      Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104-132, 110 Stat. 1214 (1996).

*Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)). An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan*, 261 F.3d at 313 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999) (quotation marks omitted)); *accord*, *e.g.*, *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007). The C.P.L. § 440.10/440.20 court denied Barney's sentencing claim in specific reliance upon *People v. Rosen*, 96 N.Y.2d 329, 728 N.Y.S.2d 407, 752 N.E.2d 844 (N.Y. 2001), in which the New York Court of Appeals sustained the constitutionality of Penal Law § 70.10 and Criminal Procedure Law § 400.20(5). The issue is whether the C.P.L. § 440.10/440.20 court's order denying the *Blakely* claim based upon *People v. Rosen* constituted an "adjudication on the merits" for AEDPA purposes.

Based upon the Second Circuit's decision in *Besser v. Walsh*, I conclude that the County Court's order did constitute such a merits-adjudication. In support of this conclusion, I note the Second Circuit held in *Brown v. Greiner*, 409 F.3d 523, 526 (2d Cir. 2005) ("*Brown I*"), that the New York State Court of Appeals in *People v. Rosen* could not have invoked state procedural law and barred Rosen's Sixth Amendment sentencing claim without first having found that the claim was without merit. *Besser*, 601 F.3d at 179 (citing *Brown I*, 409 F.3d at 532). Subsequently, in *Brown v. Miller*, 451 F.3d 54, 56-57 (2d Cir. 2006) ("*Brown II*"), the Second Circuit held that a state court's citation to *People v. Rosen* in holding that an *Apprendi* claim was procedurally barred established that the state court decision was sufficiently interwoven with federal law so as to preclude a finding that the state court decision rested upon an adequate and independent state ground. *Besser*, 601 F.3d at 179 (citing *Brown II*, 451 F.3d at 56-57). Accordingly, the state courts' procedural rulings relying upon *People v. Rosen* the in the *Besser* cases were not "adequate" and "independent" grounds for the decision and did not bar the

Second Circuit from addressing the *Apprendi* federal claims on habeas review. *Id.* (citations omitted).[10]

### 4.  What is the "Clearly Established" Supreme Court Precedent for AEDPA purposes in the context of deciding a Sixth Amendment sentencing claim based on *Apprendi*?

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state court decision." *Williams*, 529 U.S. at 412. *Accord Besser*, 601 F.3d at 178. To assess "clearly established" law, federal habeas courts apply rules of retroactivity that are generally consistent with those set forth in *Teague v. Lane*, 489 U.S. 288 (1989). *Id.* at 178-79 (citing *Mungo v. Duncan*, 393 F.3d 327, 333-34 (2d Cir. 2004)). *Teague* held that retroactive application of "new" legal rules on collateral review is prohibited. *Id.* (citing *Teague*, 489 U.S. at 295-96; *see also id.* at 301 (O'Connor, J., concurring)).

Under *Teague*, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301; *accord Besser*, 601 F.3d at 179. "AEDPA similarly forbids retroactive application of 'new' legal rules." *Id.*

---

10  Under the circumstances present here, Barney's failure to raise this claim on direct appeal did not affect its later review under AEDPA. *See Abdul-Kabire v. Quarterman*, n. 3 (2007) (" Although Cole had not raised any of the 21 claims presented in his state habeas application on direct appeal–including his claim that the jury heard significant mitigating evidence which it could neither consider nor give effect to under the Texas sentencing statute, in violation of *Penry I*–under state law, his Penry claim remained cognizable on state habeas review. *See Ex parte Kunkle*, 852 S.W.2d 499, 502, n. 3 (Tex. Crim. App.1993) (*en banc*) (holding that "we have held that [allegations of *Penry* error occurring in cases tried before *Penry*] are cognizable via habeas corpus despite an applicant's failure to raise them on direct appeal"). Nor did Cole's failure to raise this claim on direct appeal affect its later review under AEDPA by the United States Court of Appeals for the Fifth Circuit. *See Jackson v. Johnson*, 150 F.3d 520, 523 (C.A.5 1998) (holding that Texas' postconviction procedures provide petitioners "adjudication on the merits" sufficient to satisfy 28 U.S.C. § 2254(d)). *See also Burch v. Millas*, 663 F. Supp.2d 151, 173) (W.D.N.Y. 2009) (Bianchini, M.J.) ("Because the state courts considered and rejected Burch's ineffective assistance claims [raised in a C.P.L. § 440.10 motion] on the merits, and did not rely upon any state procedural rules for dismissal, "this case is subject to the deferential standard of review of state court adjudications" under AEDPA.") (quotation omitted).

(citing *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003) ("Clearly established federal law . . . is

law that is 'dictated by [Supreme Court] precedent existing at the time the defendant's conviction

became final.'") (quoting *Williams*, 529 U.S. at 381, 120 S.Ct. 1495 (Stevens, J., concurring)).

However, the Second Circuit held in *Besser*, "the point of reference for determining

'clearly established law' may differ from the reference point used under *Teague* to determine

whether a legal rule is 'new.'" *Besser*, 601 F.3d at 179. Before getting to that question, the

Second Circuit first addressed whether it was objectively unreasonable to uphold petitioners'

Class A-I sentences in light of the Supreme Court decisions applying *Apprendi*. That inquiry

gave rise to two further questions: first, to what period of time does a habeas court look in

determining whether a legal rule was "clearly established" under AEDPA; second, to what extent

does AEDPA allow us to consider Supreme Court cases that postdate the relevant period

selected. *Besser*, 601 F.3d at 179-80. This Court will follow the *Besser* court's analytical

framework.

The Second Circuit explained in *Besser* that "*Blakely* clarified *Apprendi* by making it

unambiguously clear *any* fact (other than a prior conviction), *no matter how generalized or*

*amorphous*, that increases a sentence for a specific crime beyond the statutory maximum must be

found by a jury." *Besser*, 601 F.3d at 181 (emphases supplied). Notably, the Second Circuit in

Besser **noted it** had twice held that a state court could reasonably have concluded–based upon

the Supreme Court decisions of *Apprendi* and *Ring*, issued *prior* to *Blakely*, that certain kinds of

judicial fact-finding did not violate *Apprendi* even if it resulted in a sentence beyond a statutory

maximum. *Besser*, 601 F.3d at 181 (citing *Brown I*, 409 F.3d at 526 (addressing *Apprendi* only,

and holding that it was not unreasonable to read *Apprendi* to proscribe only those sentencing

schemes that permit a court to find some statutorily enumerated, specific fact(s) to impose an enhanced sentence; New York Court of Appeals thus did not unreasonably apply federal law in its 2001 case of *People v. Rosen*)); *see also Brown II*, 451 F.3d at 56-57 (addressing both *Apprendi* and *Ring*; reconsidering *Brown I* in light of *Ring v. Arizona* and concluded that *Ring* had not undermined *Brown I*). It bears emphasizing that *Brown I* and *Brown II* did not address the effect of *Blakely* because they held that *Blakely* did not apply, since it was not "clearly established" at the "relevant time." 601 F.3d at 181 (citing *Brown II*, 451 F.3d at 59 n. 3; *Brown I*, 409 F.3d at 533 & n. 3).

For the Second Circuit, *Blakely* marked a critical point. If *Blakely* postdated the "relevant time" for any petitioner in *Besser*, then the Second Circuit's *Brown* cases were controlling, and an *Apprendi* challenge would be foreclosed. 601 F.3d at 183 (citing *Brown II*, 409 F.3d at 535; *Brown I*, 451 F.3d at 59). On the other hand, if *Blakely* predated the "relevant time", then an *Apprendi* challenge could proceed. *See id.*

*Besser* involved five appellants–Besser, Phillips, Portalatin, Morris, and Washington. For four out of the five petitioners in *Besser*, it did not matter which formula was used in assessing the "relevant time". Besser's case was the simplest situation–he raised his *Apprendi* claim on direct appeal only, and it was denied when his conviction was affirmed. Besser's direct review was completed, and his conviction became final, well before *Blakely* was decided. Thus, looking at the relevant time under the *Teague* definition or the *Abdul-Jabir* definition, the outcome was clearly the same for Besser.

Portalatin, Morris, and Washington presented a second procedural scenario. These appellants were all sentenced at least two years before *Blakely* was decided. They all attacked the

legality of their PFO sentences on direct appeal. While the direct appeals of their *Apprendi* claims were pending, *Blakely* was issued. The Second Circuit held that because the "relevant state court decisions" (in their cases, orders denying leave to appeal to the New York Court of Appeals) all postdated *Blakely*, the circuit court was required to evaluate New York's sentencing law in their cases in light of *Blakely*. I also note that the convictions of Portalatin, Morris, and Washington became final after *Blakely*.[11]

Appellant Phillips's case presented a third permutation for the *Besser* court to consider. Like the other four petitioners in *Besser*, Phillips was adjudicated a persistent felony offender and sentenced before the Supreme Court issued *Blakely* in 2004. Phillips raised for the first time an *Apprendi* challenge to his sentence in a collateral proceeding brought pursuant to New York Criminal Procedure Law § 440.20. *Besser v. Walsh*, 601 F.3d 176. On June 25, 2003, the C.P.L. § 440.20 court rejected his claim on the merits, and Phillips appealed *both* his conviction and the denial of his C.P.L. § 440.20 motion. *Id.* On December 18, 2003, in an appeal consolidating both applications, the Appellate Division unanimously affirmed the underlying conviction and the denial of the C.P.L. § 440.20 motion. *Id.*[12]  On June 24, 2004, the *same* day on which *Blakely* was issued, the  New York Court of Appeals denied Phillips leave to appeal without prejudice to renewal. Phillips renewed his application for leave to appeal. In the months while Phillips' application for reconsideration was pending, the Supreme Court, on September 23, 2004, denied rehearing in *Blakely*.  One week later, on September 30, 2004, the New York Court of Appeals

---

[11]         This is how Besser's case differed from those of Portalatin, Morris, and Washington, in that Besser's conviction became final, and the relevant state court decision in his case was issued, *before Blakely*.

[12]         In Phillips' case, neither the C.P.L. § 440.10 court nor the intermediate appellate court considered *Blakely*, which had not been decided yet.

denied Besser leave upon reconsideration. *Id.* (citations omitted).[13]

The Second Circuit summarized,

> Besser's conviction became final well before *Blakely*, and our *Brown* decisions dispose of his claim for habeas relief. Similarly, because the state court decisions involving Portalatin, Morris and Washington all postdate *Blakely*, their claims are not controlled by the *Brown* decisions, and we must instead evaluate New York's sentencing law in light of *Blakely*. However, *Blakely* came down after the New York Appellate Division decided Phillips' appeal but before the Court of Appeals of New York denied Phillips leave to appeal. Phillips' appeal thus turns on which approach we adopt in determining the relevant time.

*Besser*, 601 F.3d at 183. The reference to "which approach" means, in this Court's opinion, that there were two different approaches–one that demarcated the "relevant time" as the time the conviction became final, as with Besser; and another approach which identified the "relevant time" as the time of the relevant state court decision adjudicating the *Apprendi* claim, as was the case with Portalatin, Morris, and Washington. It bears noting that the convictions of appellants Portalatin, Morris, and Washington apparently all became final at the same time the state courts adjudicated their *Apprendi* claims. Because the Second Circuit singled out Phillips' case as raising an issue as to what was the "relevant time", this Court infers that Phillips' conviction became final at the time that the New York Court of Appeals first denied leave to appeal on June 24, 2004, the date on which *Blakely* was issued. If the conviction became final when the Court of Appeals denied Phillips' application for reconsideration, then there would not have been an issue of determining the "relevant time" because the relevant state court decision *and* the date of

---

[13] This Court has gone into the details of the procedural course appellant Phillips followed to present his *Apprendi* claim to the New York state courts to deflect any argument that respondent may make that Barney has failed to exhaust his *Apprendi* claim because he first raised it in a collateral motion for *vacatur* pursuant to C.P.L. §§ 440.10 and 440.20.

finality of the conviction both would have post-dated *Blakely*.

Before analyzing which time period should identify the "relevant time" for AEDPA

purposes, the Second Circuit reiterated its observation that the Supreme Court had provided

"inconsistent guidance" on this subject. *Id.* (quoting *Brown II*, 451 F.3d at 57 n. 1; *Brown I*, 409

F.3d at 533 n. 3) (quotation marks omitted); *see also id.* n. 10 (explaining that the confusion

originated in the Supreme Court's fragmented decision in *Williams v. Taylor*, in 2000, which

considered the interplay between AEDPA and the non-retroactivity doctrine of *Teague v. Lane*,

489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)).[14] The Second Circuit noted the

Supreme Court's 2007 decision in *Abdul Kabir v. Quarterman*, 550 U.S. 233, 237 (2007)

(Stevens, J., for the majority) (emphasis supplied); *accord Besser*, 601 F.3d at 183. The Second

Circuit explained that it understood "this formulation [in *Abdul-Kabir*] to mean that

> *any* state court decision involving the merits of an *Apprendi* claim is an
> application of federal law, whether or not the decision contains a discussion. Even
> if such a decision is a denial of leave to appeal or denial of a motion for
> reconsideration, application of federal law is still a factor that we must deem a
> state court to have considered.

*Besser v. Walsh*, 631 F.3d at 183-84 (emphasis supplied). Therefore, the Second Circuit held,

"the relevant time [is] to be the date on which a decision regarded as final under state law–which

may or may not include the *certiorari* period (not an issue here)–has been entered in a

---

[14] The Supreme Court in *Williams* interpreted the term "clearly established federal law" as generally codifying *Teague v. Lane*'s rule against retroactive application of cases announcing "new" legal rules. *Besser*, 601 F.3d at 183 n.10 (citing *Williams*, at 390-91, 120 S.Ct. 1495 (Stevens, J., for the Court) (citing *Teague*, 489 U.S. at 301, 109 S.Ct. 1060)). With regard to whether the operative period for assessing "clearly established" law was the same as the period for determining whether a rule is "new" for *Teague* purposes, the Supreme Court gave two different answers. *Id.* (citing *Teague*, 489 U.S. at 301, 109 S.Ct. 1060 (O'Connor, J., concurring) (Under *Teague*, the relevant period is "the time the defendant's conviction became final."). Justice Stevens, speaking for the Court in *Williams*, concluded that the relevant period for AEDPA purposes was the same as the *Teague* period. *Williams*, 529 U.S. at 390, 120 S.Ct. 1495 (Stevens, J., for the Court). Justice O'Connor, speaking later for the *Williams* Court, concluded that habeas courts should look to "clearly established" law at the time of the "relevant state-court decision" or "state-court adjudication." *Id.* at 412, 120 S.Ct. 1495 (O'Connor, J., for the Court).

-37-

proceeding deemed to involve the merits for federal habeas purposes." *Id.* at 184. Thus, in

petitioner Phillips' case in *Besser*, the Second Circuit held that, based on *Abdul*'s explication,

Phillips could "rely upon *Blakely* as clearly established while the state courts were actively

reviewing his claims." *Besser*, 601 F.3d at 184. In other words, the time of "active[ ] review[ ],"

*id.*, included the time that Phillips' application for leave to appeal was pending[,] *id.*

    Barney's case presents a fifth permutation. Like all of the appellants in *Besser v. Walsh*,

Barney was adjudicated as a persistent felony offender and sentenced *prior* to the issuance of

*Blakely*. *See Besser*, 601 F.3d at 177-78. Like Besser, Barney's conviction by way of direct

appeal became final well before *Blakely* was issued. Thus, if one were to equate the *Teague*

"relevant time" with the AEDPA "relevant time", Barney's case would be governed by the

Second Circuit's decisions in *Brown I* and *Brown II*, and Barney would not be able to rely upon

*Blakely*. However, the Second Circuit in *Besser* adopted a different formulation, based the

Supreme Court's 2007 decision in a § 2254 habeas case, *Abdul-Jabir v. Quarterman*, pursuant to

which the "relevant time" for habeas purposes is the relevant state-court judgment adjudicating

the *Apprendi* claim.

    In Barney's case, the "relevant state-court judgment" is the Appellate Division's order

denying leave to appeal the trial court's denial of the C.P.L. § 440.10 motion in which he raised

the *Apprendi/Blakely* claim. As noted above, the initial C.P.L. § 440.10 order was issued on

August 11, 2005, and the application for leave to appeal that denial was denied later in 2005 by

the Appellate Division.[15] Based upon *Besser*, I conclude that the relevant time period for

---

[15]    Here, Barney's motion to vacate was filed in 2004, after *Blakely* was decided, and in specific reliance upon *Blakely*'s holding. The state court denied relief on the basis that *People v. Rosen* correctly determined that the PFO statute was constitutional, even in light of *Blakely*. In other words, *Blakely* was "clearly established"

-38-

Petitioner here postdated *Blakely*, the Supreme Court decision which clarified *Apprendi* and clearly established the legal rule invoked herein. In other words, *Blakely* was clearly established federal law "as of the time of the relevant state-court decision" in Barney's case (i.e., both the C.P.L. § 440.10 order initially denying relief and the Appellate Division's order denying leave to appeal). *See Besser v. Walsh*, 601 F.3d at 184.

After determining that the 2004 *Blakey* decision constituted "clearly established" Federal law for four of the petitioners, the *Besser* panel went on to decide whether it could consider the Supreme Court's 2007 decision, *Cunningham v. California*, as well. *Cunningham* invalidated California's statutory scheme for recidivist/enhanced sentencing, which, as the Second Circuit described, was very similar to New York's persistent felony offender statute. *Besser*, 601 F.3d at 184 (citing in *Cunningham v. California*).

The State in *Besser v. Walsh* objected to the Second Circuit considering *Cunningham* as "clearly established Federal law" because its issuance post-dated the relevant state court decisions for the *Besser* petitioners for whom *Blakely* was found to be "clearly established" at the "relevant time." *Id.* The Second Circuit rejected this contention, explaining that

> [u]nder both AEDPA and *Teague* [*v. Lane*], a petitioner may rely on a decision issued subsequent to the relevant period if that decision is "dictated" by preexisting Supreme Court precedent. By "dictated," we mean that the result must have been "apparent to all reasonable jurists" during the operative time frame. Accordingly, neither *Teague* nor AEDPA preclude us from considering post-dated decisions that merely restate or codify "old" rules of law that were "clearly established" at the time.

> Applying that principle here, we conclude that *Blakely* compelled the result in

---

after Barney's conviction became final on direct review, but before the "relevant state court judgment" (i.e., the C.P.L. § 440.10/440.20 order and the Appellate Division's order denying leave to appeal denial of C.P.L. § 440.10/440.20 relief).

*Cunningham* and that we must therefore consider it as "clearly established law" for AEDPA purposes. *Cunningham* presented no issue of fact or law materially distinguishable from *Blakely* because the sentencing schemes in *Blakely* and *Cunningham* were "closely analogous." *See Butler v. Curry*, 528 F.3d 624, 635-36 (9th Cir.2008). Both schemes required a judge to impose a sentence within a standard range absent a finding of circumstances (other than those taken into account in the conviction) justifying an enhanced sentence. *See Cunningham*, 127 S.Ct. at 861-62; *Blakely*, 542 U.S. at 304, 124 S.Ct. 2531. And we agree with the Ninth Circuit that *Cunningham*, in rejecting California's scheme, merely "reiterated the[ ] same points, rejecting arguments already disapproved in *Blakely*. . . . [It] did not add '"any new elements or criteria for"' determining when a state statute violates the Sixth Amendment." *Butler*, 528 F.3d at 636 (citation omitted).

*Besser v. Walsh*, 601 F.3d at 184 (some internal citations omitted; alterations in original).

> **5.    Whether the State Courts' Adjudications of Barney's Claim Were Contrary to, or an Unreasonable Application of, *Blakely* and *Cunningham***

The Second Circuit's decision in *Besser* squarely held that New York's persistent felony offender statutory scheme violates the Sixth Amendment's guarantee of a trial by jury, as explicated by the Supreme Court in *Blakey* and *Cunningham*:

> We believe that upholding this scheme[16] [i.e., N.Y. Penal Law § 70.10 and C.P.L. § 400.20] was an unreasonable application of *Blakely*/*Cunningham*. There is no material difference between the PFO statute and the schemes that the Supreme Court found objectionable in *Blakely*/*Cunningham*.

*Besser*, 601 F.3d at 186. This Court need not repeat the Second Circuit's thorough analysis but finds instructive some of the similarities among the Washington state, California and New York statutes. First, as was the case under both the Washington law at issue in *Blakely* and the California law challenged in *Cunningham*, a convicted felony defendant in New York with a certain number of predicate felonies is "eligible for" or "subject to" a sentencing range with a

---

[16]    "[F]irst felony offenders are generally subject to a low minimum and a maximum that varies greatly depending on the crime, *see* N.Y. Penal Law § 70.00; second felony offenders are generally subject to a higher minimum and a maximum that is the same as that for first felony offenders, *see* N.Y. Penal Law § 70.06.

high maximum. 601 F.3d at 186 (citing *Cunningham*, 127 S.Ct. at 861-62; *Blakely*, 542 U.S. at 299, 124 S.Ct. 2531); *compare with* N.Y. PENAL LAW § 70.10, N.Y. CRIM. PROC. LAW § 400.20 (a defendant with two felony convictions is a persistent felony offender subject to a Class A-I maximum of life but may be sentenced within a lower range, usually as a second felony offender or second violent felony offender, if the prosecution fails to show that the history-character-criminal conduct factors justify a Class A-I sentence).

In the Washington and California schemes found unconstitutional in *Blakely* and *Cunningham*, respectively, "before a sentencing court could exercise its discretion to impose a sentence in the range with the high maximum, it had to conclude that some aggravating or compelling circumstance justified it." *Besser*, 601 F.3d at 186 (citing *Cunningham*, 127 S.Ct. at 861 (allowing for an enhanced sentence upon the finding of "circumstances in aggravation"); *Blakely*, 542 U.S. at 299, 124 S.Ct. 2531 (allowing for enhanced sentencing upon a finding of "substantial and compelling reasons"). Absent such findings, sentencing courts in Washington and California "lacked any discretion to sentence above the standard range that had a lower maximum." *Id.* (citing *Cunningham*, 127 S.Ct. at 862; *Blakely*, 542 U.S. at 304). Such is the case with New York's persistent felony offender scheme, which the Second Circuit found "virtually indistinguishable" since the law allows imposition of higher-tier, Class A-I sentences *only* when the sentencing judge has made factual findings related to a defendant's criminal history, character, and nature of the criminal conduct that justify the higher sentencing range. *Besser*, 601 F.3d at 186-87 (citing N.Y. PENAL LAW § 70.10 (2); N.Y. CRIM. PROC. LAW § 400.20(1); *People v. Rivera*, 800 N.Y.S.2d 51, 833 N.E.2d at 197 n. 3 ("The law goes on to require a hearing or hearings, at which the People must prove to the court, beyond a reasonable doubt, the

fact of defendant's prior convictions, and either party may offer evidence (subject to a preponderance of-the-evidence standard) bearing on the court's exercise of discretion as to whether a recidivist sentence is warranted." (citation omitted)).

Similar to the Washington and California statutes, New York's persistent felony offender scheme does not permit the judge to select the Class A-I sentence unless certain judgments have been made concerning character and criminality. If the court does not do so, it must provide a sentence authorized by the other provisions of Article 70 [of the Penal Law], such as a second felony offender sentence, *Id.* (citing N.Y. PENAL LAW § 70.10(2); N.Y. CRIM. PROC. LAW § 400.20(1); *Rivera*, 800 N.Y.S.2d 51, 833 N.E.2d at 198 ("Criminal Procedure Law § 400.20(1) provides that a defendant may not be sentenced as a persistent felony offender until the court has made the requisite judgment as to the defendant's character and the criminality.")).

> To sum up, [New York's] PFO statute cannot be squared with the statement by Justice Ginsburg in her opinion for the Court in *Cunningham*: "If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." [127 S. Ct.] at 869.

*Besser v. Walsh*, 601 F.3d at 188 (quotation omitted). Clearly, Barney's sentence was based on facts, other than a prior conviction, that were neither admitted by Barney nor submitted to a jury and proven by the prosecutor beyond a reasonable doubt. *See Washington v. Recuenco*, 438 U.S. at 216 ("In *Blakely*, we clarified that 'the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.'") (quoting *Blakely*, 542 U.S., at 303) (emphasis in original)). Rather, Barney's persistent felony offender sentence was authorized only after the trial judge engaged in supplemental fact-finding. *See Besser*, 601 F.3d at 188 ("To sum up, the

PFO statute cannot be squared with the statement by Justice Ginsburg in her opinion for the Court in *Cunningham*: 'If the jury's verdict alone does not authorize the sentence, if instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.'") (quoting *Cunningham*, 127 S. Ct. at 869).

As explained by the Second Circuit in *Besser v. Walsh,* the Supreme Court's decision in *Blakely v. Washington* compels the conclusion that the Sixth Amendment was violated when Barney was adjudicated and sentenced as a persistent felony offender. Thus, based upon the Second Circuit's holding in *Besser v. Walsh*, I conclude that the state court's decision affirming Barney's adjudication as a persistent felony offender and the imposition of a class A-I sentence was an unreasonable application of clearly established Federal law as set forth in *Blakely v. Washington* and in *Cunningham v. California.*

### 6. Applicability of a harmless error analysis to *Apprendi/Blakely* errors

Finding that constitutional error infected Barney's sentencing does not end the matter, however. *Besser*, 601 F.3d at 188. "[T]he Supreme Court has held that a state court's failure to submit a sentencing factor to the jury, a Sixth Amendment violation under *Blakely*, is not structural error and is subject to harmless error analysis." *Id.* at 189 (citing *Washington v. Recuenco*, 548 U.S. 212, 218-19, 221-22 (2006)). In *Recuenco*, respondent was convicted of assault in the second degree based on the jury's finding that he assaulted his wife "with a deadly weapon." The trial court applied a 3-year firearm enhancement to respondent's sentence based on its own factual findings, in violation of *Blakely v. Washington*, 542 U.S. 296. On appeal, the Supreme Court of Washington vacated the sentence, concluding that *Blakely* violations can never be harmless. The narrow question on which the Supreme Court granted *certiorari* was whether

*Blakely* error can ever be deemed harmless, and it answered in the affirmative. *Recuenco*, 548 U.S. at 218.

The Supreme Court has "repeatedly recognized," *id.* at 218, that commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal, and "'most constitutional errors can be harmless'"; it is only the rare case that an error is deemed "structural" so as to require automatic reversal. *Id.* at 219 (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991) (some quotation marks omitted)). In *Neder*, a case involving the direct appeal of a criminal conviction under 18 U.S.C.A. § 7206(1) for tax fraud, the Supreme Court held that the trial court's error in failing to charge the jury on the offense-element of "materiality" did not render defendant's trial fundamentally unfair, so as to preclude harmless-error review. The *Neder* court remanded the matter to the circuit court of appeals for it to consider in the first instance whether the jury-instruction error was harmless.

From a Sixth Amendment standpoint, the court in *Recuenco* found the facts of *Neder* "indistinguishable," *Recuenco*, 548 U.S. at 220, from the sentencing error presently at issue. *Id.* ("The only difference between this case and *Neder* is that in *Neder*, the prosecution failed to prove the element of materiality to the jury beyond a reasonable doubt, while here the prosecution failed to prove the sentencing factor of 'armed with a firearm' to the jury beyond a reasonable doubt. Assigning this distinction constitutional significance cannot be reconciled with our recognition in *Apprendi* that elements and sentencing factors must be treated the same for Sixth Amendment purposes."). The Supreme Court explained that its "decision in *Apprendi* makes clear that '[a]ny possible distinction between an "element" of a felony offense and a

"sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding.'" *Id.* (quoting *Apprendi*, 530 U.S. at 478) (footnote omitted)). Accordingly, the Supreme Court had "treated sentencing factors, like elements, as facts that have to be tried to the jury and proved beyond a reasonable doubt." *Id.* (citing *Apprendi*, 530 U.S. at 483-84). Based upon its jurisprudence declaiming any difference between sentencing factors and offense elements for Sixth Amendment purposes, the Supreme Court in *Recuenco* held that the "[f]ailure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error . . . ." 548 U.S. at 222; *accord Butler v. Walsh*, 528 F.3d 624, 648 (9th Cir. 2003). Recuenco's case was remanded to the Supreme Court of Washington for a determination of whether the sentencing error was harmless under state law. *Recuenco* thus provides no guidance as to which harmless error standard to apply to *Apprendi/Blakely* errors challenged in a collateral proceeding.

### 8. Which "harmless error" standard?

In 2007, the Supreme Court had adopted harmless error standard set forth in *Brecht* for cases involving collateral review of state-court decisions" under 28 U.S.C. § 2254." *Villagarcia*, 99 F.3d at 537 (citing *Fry v. Pliler*). Under *Brecht*, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). Thus, the Supreme Court explained in *Fry*, a federal habeas "court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the substantial and injurious effect standard . . . , whether or not the state appellate court recognized the error . . ." 551 U.S. at 116 (internal quotation marks omitted). The *Brecht* standard alternately as been described as "less defendant

friendly" and "more state friendly", in comparison with *Chapman v. California*'s "beyond a reasonable doubt" formulation, which applies on direct review of a criminal conviction. *Chapman* held that relief is warranted on a constitutional violation only if the reviewing court is assured, beyond a reasonable doubt, of its harmlessness.

As the Second Circuit explained in *Besser,* the government bears the burden of persuasion in proving that a constitutional error was not harmless. 601 F.3d at 189 (citing *Fry*, 127 S.Ct. at 2327 n. 3; *United States v. Dominguez Benitez*, 542 U.S. 74, 81 n. 7, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)). "'[I]n cases of grave doubt as to harmlessness the petitioner must win[.]'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)). "[G]rave doubt[,]" *O'Neal*, 513 U.S. at 437, exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error[,]" *id.* at 435, 115 S.Ct. 992 (quoted in *Besser*, 601 F.3d at 189; *Butler v. Curry*, 528 F.3d at 648).

Under the *Brecht* test, a Sixth Amendment sentencing error is not harmless if the court is left in "grave doubt" as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt. Butler, id. (citing *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)). Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. at 435., 115 S.Ct. 992. *See also Recuenco*, 548 U.S. at 221-22. If a habeas court reviewing an *Apprendi* error under New York's persistent felony offender law is in "grave doubt as to the harmlessness of [the] error," *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995), "it should grant relief[,]" *id. See also Butler*, 528 F.2d at 648 (" Under that standard, we must grant relief if we

are in 'grave doubt' as to whether a jury would have found the relevant aggravating factors

[under California's DSL] beyond a reasonable doubt."). "Grave doubt exists when, 'in the

judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the

harmlessness of the error.'" (quoting *O'Neal*, 513 U.S. at 435).

The Supreme Court has not ruled on the question of which harmless error standard

applies in a federal collateral challenge to an *Apprendi*/*Blakely* violation by a state sentencing

court. *See Villagarcia v. Warden, Noble Correctional Institute*, 99 F.3d 529, 537 (6th Cir. 2010)

(noting that there is no case directly on point from the Supreme Court in which it conducts a

harmless error analysis on collateral review of a sentencing error); *see also Barela v. Schriro*,

2008 WL 4447002, *6 (D. Ariz. 2008) (stating that it is not clear which harmless error test

applies to a *Blakely* claim brought in a § 2254 habeas petition).[17]

The Ninth Circuit has held that the *Brecht* standard applies in 28 U.S.C. § 2254 habeas

challenges wherein California inmates allege that they were sentenced under the DSL in violation

of *Apprendi*/*Blakely*. *E.g.*, *Butler v. Curry*, 528 F.3d 624, 648 (9th Cir. 2008) (adopting *Brecht*'s

standard for cases involving collateral review of state-court decisions) (citing  *Hereford v.

Warren*, 536 F.3d 523, 532-33 (6th Cir. 2008)).  In *Butler*, as discussed further, *infra*, the Ninth

Circuit found that the appellate record did not contain sufficient facts to make the requisite

harmless-error analysis and remanded the case to the district court for further proceedings.

The Second Circuit likewise has determined that *Brecht* applies to *Apprendi*/*Blakely*

---

[17]     The district court in *Barela* court pointed out that for cases involving *Apprendi*-type error,
however, "the standards might be more stringent[,]" based upon its reading of *Washington v. Recuenco* and *Neder v.
United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), as stating that such an error is harmless "if the
court finds beyond a reasonable doubt that the result 'would have been the same absent the error.'" *Barela v.
Schriro*, 2008 WL 4447002, at *6  (quoting *Neder v. United States*, 527 U.S. at 19).

challenges brought by New York prisoners sentenced under Penal Law § 70.10: "In deciding whether the application of the unconstitutional [persistent felony offender] statute to each petitioner was harmless, [the court] must apply the *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), test and ask if the error "had substantial and injurious effect or influence" on the sentence." *Besser*, 601 F.3d at 189 (quoting *Brecht*, 507 U.S. at 631, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946) (quotation marks omitted).  As authority for this proposition, the *Besser* panel cited, *inter alia*, *Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 2328, 168 L.Ed.2d 16 (2007) and *Butler v. Curry*, 528 F.3d at 648 and *Calderon v. Coleman*, 525 U.S. 141, 145-47 (1998) (*per curiam*) (holding that for habeas relief to be granted based on constitutional error in the capital penalty phase, the error must have had a substantial and injurious effect on the jury's verdict in the penalty phase).

In *Besser*, the Second Circuit declined to address whether the sentencing errors it had found were harmless when analyzed under *Brecht*. Noting that none of the district courts made a detailed analysis of the harmless error issue with respect to the sentences for the four petitioners, the Second Circuit instead remanded the cases to the district courts for further proceedings to develop the record on the question of harmlessness. *Besser*, 601 F.3d at 189. The *Besser* panel found it could not accurately address the harmless error matter in the first instance itself because the "record on appeal" was not "sufficiently developed" in any of the appellants' cases.

In view of the Second Circuit's disposition in *Besser*, this Court has considered whether it is in a proper position to undertake the harmless error assessment itself. Here, the Court has all of the state court records before it, including the transcripts of the predicate felony hearing and the sentencing hearing. The Court believes the record is "sufficiently developed" for  it to accurately

address the harmless error issue and, moreover, cannot identify what additional information a court would need in order to do so with more accuracy. As of the time of this Court's writing, decisions had not been issued in the remanded cases from the *Besser* appeal and so the Court does not have the benefit of those courts' analyses. As noted above, however, the Second Circuit did not provide further guidance on how to apply *Brecht* to gauge the harmlessness of the constitutional error arising from imposition of a sentence pursuant to the persistent felony offender statutory scheme (N.Y. PENAL LAW § 70.10 and N.Y. CRIM. PROC. LAW § 400.21). Finally, the Court has looked for guidance to decisions of the district courts in California ruling on § 2254 habeas petitions in which the petitioners have argued that they were sentenced unconstitutionally under California's Determinate Sentencing Law ("DSL"), based on the Supreme Court's holding in *Cunningham*. Where these courts have found *Cunningham* error, they have addressed themselves to the question of whether the sentencing errors were harmless, rather than remanding the cases to the state courts.[18]

Therefore, the Court looked to how California district courts and the Ninth Circuit has addressed habeas challenges to its recidivist sentencing scheme, the DSL, which was held unconstitutional by the Supreme Court in *Cunningham* and which the Second Circuit characterized as similar to New York's persistent felony offender statute. The Court also reviewed cases from the Sixth Circuit considering habeas challenges to Ohio's sentencing

---

[18]    The Court has not found any cases where the federal habeas court has held an evidentiary hearing on this issue, although the Court believes that in certain cases, such a hearing would be warranted. *See Butler v. Curry*, 528 F.3d 651-52 ("Whether a jury would have found [petitioner]'s probationary status [an aggravating factor under California's invalidated determinate sentencing law] beyond a reasonable doubt turns out to be, on the record in this case, a difficult question to answer. The record before the district court does not reveal what evidence on the probation issue was presented to the state trial court. We therefore remand to the district court for an evidentiary hearing on that question.").

-49-

enhancement statute, which was held unconstitutional by the highest state court of appeal in

Ohio. Ohio's statute, part of which was severed by the state court of appeal in order to make it

comply with *Apprendi/Blakely*, appears to this Court to be even more similar to New York's PFO

statute than California's DSL. In addition, the Court was guided by statements by the United

States Supreme Court in *Washington v. Recuenco* on the issue of showing harmfulness of an

*Apprendi/Blakely* error.

### 9. The Ninth Circuit's application of *Brecht* vis-a-vis California's Determinate Sentence Law

California's determinate sentencing law remains on the books. Subsequent to the

Supreme Court's remand to the state's high court for a reinterpretation, the Ninth Circuit has

deferred to the state court's revised view of the DSL as only requiring that only one aggravating

factor is necessary to set the upper term as the maximum sentence. Judges are not precluded

under the Sixth Amendment from "'exercis[ing] discretion–taking into consideration various

factors relating both to offense and offender–in imposing a judgment within the range prescribed

by statute.'" *Butler v. Curry*, 528 F.3d at 643 (quoting *Apprendi*, 530 U.S. at 481, 120 S.Ct.

2348). Thus, in determining the length of a sentence, "judges may 'implicitly rule on those facts

[they] deem[ ] important to the exercise of [their] sentencing discretion.'" *Id.* (quoting *Blakely*,

542 U.S. at 309). For that reason, the Ninth Circuit held, "if at least one of the aggravating

factors on which the judge relied in sentencing Butler [under California's DSL] was established

in a manner consistent with the Sixth Amendment, Butler's sentence does not violate the

Constitution. Any additional factfinding was relevant only to selection of a sentence within the

statutory range." *Id.*

Under California's DSL, it has been held that "only one aggravating factor is necessary to set the upper term as the maximum term[,]" *Butler*, 528 F.3d at 648, and therefore "[a]ny *Apprendi* error therefore will be harmless if it is not prejudicial as to just one of the aggravating factors at issue[,]" *id.* The state trial court in *Butler* had relied upon two of the statutorily-listed aggravating factors (that victim was "vulnerable" and that petitioner was on probation when he committed the crime) and had found them as facts based upon less than a reasonable doubt standard; hence, the *Apprendi* error. The district court reviewing Butler's habeas claim had noted that it was impossible to know what the trial court would have done had it found only one aggravating factor; for instance, it might have issued a lesser sentence, one below the upper-term range. In light of that uncertainty, the district court in *Butler* concluded, the Sixth Amendment violation could not be harmless unless the error did not affect *either* of the aggravating factors upon which the judge relied. *Butler*, 528 F.3d at 648. The Ninth Circuit disagreed:

> With regard to a Sixth Amendment sentencing violation, however, the relevant question is not what the trial court *would* have done, but what it legally *could* have done. After one aggravating factor was validly found, the trial court legally *could* have imposed the upper term sentence. That the judge might not have done so in the absence of an additional factor does not implicate the Sixth Amendment, as that consideration concerns only the imposition of a sentence within an authorized statutory range.

*Butler*, 528 F.3d at 648-49 (emphases in original).

As noted above, the Ninth Circuit squarely has held that in cases of *Apprendi* error, the habeas must apply *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), and determine whether the error had a "substantial and injurious effect or influence" on a petitioner's sentence. *Butler v Curry*, 528 F.2d at (citing *Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir. 2001) (applying *Brecht* harmless error standard to state court's weighing of unconstitutional aggravating factor in

sentencing)). The Ninth Circuit explained that in conducting a harmless error review of an *Apprendi* violation, a reviewing court could consider evidence presented at sentencing proceedings, but it could "not consider new admissions made at sentencing in [its] harmless error inquiry," *Butler*, 528 F.3d at 648 (quoting *Salazar-Lopez*, 506 F.3d at 755 (citing *United States v. Jordan*, 291 F.3d 1091, 1097 (9th Cir.2002); *United States v. Nordby*, 225 F.3d 1053, 1061 n. 6 (9th Cir.2000), overruled on other grounds by *United States v. Buckland*, 289 F.3d 558, 568 (9th Cir.2002) (*en banc*)).

The Ninth Circuit then considered the evidence in the record regarding the two aggravating factors considered by the state sentencing judge–that the victim was "particularly vulnerable" and that the petitioner was on probation when he committed the offense. The proof as to the first aggravating factor left the Ninth Circuit with a "'grave doubt' as to whether a jury would have found, beyond a reasonable doubt and based solely on the circumstance of being attacked from behind, that [the victim in question] was a 'particularly vulnerable' victim of domestic violence." *Id.* at 651. Accordingly, the Ninth Circuit found, the *Apprendi* error was not harmless with regard to the first aggravating factor. *Id.* (citing *O'Neal*, 513 U.S. at 445 ("[W]e conclude that, when a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief.")). Nevertheless, the Ninth Circuit did not grant habeas relief based on that error because the state sentencing court *could* have relied solely upon the second aggravating factor (probationary status) to impose the enhanced sentence. *See id.* Therefore, the circuit court asked whether a jury would have found beyond a reasonable doubt that Butler was on probation (the second aggravating factor). That, however, was a "difficult question to answer" because the record before the district court did not reveal what evidence

pertaining to petitioner's probationary status was presented to the state trial court. The Ninth Circuit remanded the case to the district court for an evidentiary hearing on that question. *Butler*, 528 F.3d at 651.

This Court finds that *Butler v. Curry*'s approach in dealing with California's DSL is inapposite to assessing harmlessness of a sentencing error under New York's PFO statute due to the different ways in which the courts have interpreted the respective statutes. Like New York's PFO statute, California's DSL has a "discretionary" component–the California Rules of Court state that "*[s]election* of the upper term is justified only if, after a consideration of all the relevant facts, the circumstances in aggravation outweigh the circumstances in mitigation," Cal. R. Ct. 4.420(b). *Butler*, 528 F.3d at 642 (emphasis in original). The Ninth Circuit held that this provision did not undermine the *Black II* court's conclusion that under the DSL, a only a single "aggravating factor" is sufficient to justify imposition of an upper-term sentence. According to the Ninth Circuit, this "weighing language" could "reasonably be interpreted as guiding a judge's discretion to *select* a term within the statutory maximum . . . after an aggravating factor has been found." 528 F.3d at 642-43 (emphasis in original). The portion of the California DSL remained intact after the Supreme Court's remand in *Cunningham v. California*: In *People v. Black II*, the California state court interpreted of the California DSL as requiring only a single aggravating factor to authorize the upper term. The Ninth Circuit held that it was bound to accept the California Supreme Court's interpretation of the DSL, following the Supreme Court's remand in *Cunningham*, because it was "not so inconsistent with prior case law or the statute itself as to suggest it [was] merely a substerfuge" "to avoid federal review." *Butler*, 528 F.3d at 642 (quotation and citations omitted). The Second Circuit, by contrast, has rejected the New York

Court of Appeals' interpretation of the PFO as an unreasonable application of clearly established Supreme Court law. *Besser*, 601 F.3d at 188.

### 8.    The Sixth Circuit's application of *Brecht* to *Apprendi* errors under Ohio's felony sentencing law

In *Villagarcia*, the Sixth Circuit applied the *Brecht* standard to affirm the district court's conditional grant of the writ to petitioner who was sentenced under Ohio's felony sentencing statute which, like the New York statute, required the sentencing court to engaging in judicial factfinding on the record before imposing sentence.  Ohio Rev. Code Ann. § 2929.14(A)(2). states that "for a felony of the second degree, the prison term shall be two, three, four, five, six, seven, or eight years." For a third-degree felony, "the prison term shall be one, two, three, four, or five years." Ohio Rev. Code Ann. § 2929.14(A)(3). The statute further provides that if the offender previously has not served a prison term, the "court shall impose the shortest prison term authorized for the offense . . . *unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others*." OHIO REV. CODE ANN. § 2919.14(B) (2003) (emphasis added).  In this respect, the Ohio statute is similar to like C.P.L. § 400.20(1). *People v. Rivera*,  800 N.Y.S.2d 51, 833 N.E.2d at 198 (N.Y. Crim. Proc. Law § 400.20(1) "provides that a defendant *may not be sentenced* as a persistent felony offender *until* the court has made the requisite judgment as to the defendant's character and the criminality.") (citing N.Y. CRIM. PROC. LAW § 400.20(1) (emphases added)). Under the Ohio statute, if the defendant had not previously served a prison term, the sentencing court was required to impose the shortest term possible unless it found certain additional facts concerning the defendant's conduct and future criminality.

-54-

Similarly, under the New York persistent felony offender statutory scheme, the sentencing court may not impose the longest sentence available (i.e., a sentence for a class A-1 felony) unless, in addition to finding the requisite prior felonies, it finds certain facts about the defendant's character, criminal conduct, and history.

In *Villagarcia*, the Ohio defendant had not previously served a prison term. Before imposing any sentence greater than shortest prison term authorized, the trial court was statutorily required to make supplemental findings on the record why the shortest sentence possible would demean the seriousness of the offender's conduct or would not adequately protect the public from future crime by the offender or others. The shortest sentence possible in Villagarcia's case without additional factfinding by the judge was two years. However, the trial court, initially, and upon a remand that occurred in the course of the state appeal, imposed seven-year sentences without making a supplemental finding regarding the adequacy or inadequacy of a two-year sentence as it was required to do under the Ohio statute. *See* Ohio Rev. Code Ann. § 2919.14(B) (2003) (where a defendant has not served a prior prison term, the "court shall impose the shortest prison term authorized for the offense . . . unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others").

Four months after Villagarcia's *Apprendi*/*Blakely* claim was denied on his state direct appeal, the Ohio Supreme Court held the sentencing scheme under which Villagarcia was sentenced unconstitutional under *Apprendi*/*Blakely* and specifically rejected the reasoning employed by the Ohio Court of Appeals in denying Villagarcia's sentencing appeal. *State v.*

*Foster*, 109 Ohio St.3d 1, 845 N.E.2d 470 (2006).[19]  The Sixth Circuit agreed that Ohio's felony

sentencing law operated in the same manner as did the statute in *Washington v. Blakely* in that

the statutory maximum was limited by another provision that set a lower maximum from which

the sentencing court could depart only upon a finding of additional facts. *Villagarcia*, 599 F.3d at

536. Therefore, the Ohio Court of Appeals' decision that Villagarcia's sentence "did not run

afoul of *Blakely* and *Apprendi*" was contrary to, and an unreasonable application of, *Blakely*.

In considering whether the Sixth Amendment error in Villagarcia's case was harmless,

the Sixth Circuit first observed that the Ohio Supreme Court had remedied the unconstitutionality

of the felony sentencing law by severing the "*Blakely*-offending" portions–that is, those

provisions that "either create[d] presumptive minimum or concurrent terms or require[d] judicial

fact-finding to overcome the presumption." *Foster*, 845 N.E.2d at 496-97.[20] This remedy left

state judges in Ohio with the full authority to sentence within the statutory range without making

factual findings justifying sentences in excess of the statutory minimum. *Villagarcia*, 599 F.3d at

537.  In other words, even if resentenced by a judge unconstrained by the severed portions of the

Ohio statutes, Villagarcia could have received the same sentence he originally received. The state

---

[19]     "Most Ohio appellate courts have determined that *Blakely* is inapplicable. They have distinguished Ohio's plan from Washington's grid system, or emphasized a sentencing court's inability to exceed a statutory range through fact-finding, or characterized required findings as traditional sentencing factors, or read the 'prior conviction' exception to *Apprendi* broadly to uphold the challenged sentences. . . . Nevertheless and unfortunately, *Blakely* is misunderstood if it is seen as inapplicable to Ohio."*State v. Foster*, 845 N.E.2d at 488.

[20]     This is the same approach taken by the United States Supreme Court in *Booker v. United States* in addressing the Sixth Amendment concerns presented by the Federal Sentencing Guidelines. In particular, *Booker* held that 18 USC § 3553(b)(1) (providing that a judge must follow the sentencing guidelines unless it is determined that there exists an aggravating or mitigating factor that warrants a different sentence) and 18 USC § 3742(e) (providing a standard of review for section 3553 sentences) are unconstitutional. After excising these portions, the Supreme Court ruled that the Federal Sentencing Guidelines should be used in an advisory fashion and that sentences should be "tailor[ed] . . . in light of other statutory concerns." *Booker*, 543 U.S. at 245-46.

argued that since Villagarcia's sentencing judge had in fact sentenced him twice to the same seven-year sentences, this was further proof of harmlessness. *Id.* Although it found this argument "not without force," *id.*, the Sixth Circuit rejected it.

With the factfinding portion of the statute severed, the court was free to sentence Villagarcia to any term within the statutory maximum of eight years without making judicial findings; nonetheless, "it also [was] not constrained to follow the formula previously dictated by the severed provision," *Id.* at 538; *see also id.* at 538-39 ("Because [Ohio Rev. Stat. Ann.] § 2929.14(B) has been severed as unconstitutional, it no longer operates as a limit on the sentencing court's discretion."). Under Ohio's prior sentencing scheme, the sentencing judge was obliged to start with a two-year sentence and then increase the sentence up to eight years after considering whether Villagarcia was serving a prison term at the time of the offense or previously had served a prison term–he was not and had not–and whether the two-year minimum term would demean the seriousness of Villagarcia's conduct or would not adequately protect the public from future crime by Villagarcia or others. *Id.* at 537-38 (citations omitted). Post-severance, however, the sentencing court could consider a number of additional statutorily-enumerated factors concerning the nature of the crime and the offender's history, as well as the stated purposes of Ohio's sentencing law (e.g., rehabilitation, deterrence, and restitution). *Id.* at 538. Some of these factors weighed in Villagarcia's favor, the Sixth Circuit found, while others did not. Because it "simply [could not] know whether the sentencing judge would accord the relevant factors the same weight when reassessing the matter outside the dictates of the severed provisions" of Ohio's felony sentencing law, the circuit agreed with the district court that the case should be remanded for resentencing. *Id.* at 539.

10. **Application of *Brecht*'s harmless error standard to petitioner's *Apprendi*/*Blakely* sentencing error under New York's persistent felony offender statute**

For the following reasons, the Court cannot conclude that the Sixth Amendment error that occurred during Barney's sentencing was harmless. Nothing in the record here reflects that the findings required to be made by the sentencing court before imposing a sentence pursuant to Penal Law § 70.10 were either admitted by Barney or found by a jury to have been proven beyond a reasonable doubt. *Villagarcia*, 2007 WL 1028528, at *6; *see generally Blakely*, 542 U.S. at 303 (The "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."). As then Chief Judge Kaye of the New York Court of Appeals explained in her dissent in *People v. Rivera*, "[e]nhanced punishment [under Penal Law § 70.10] 'may not be imposed' unless the court makes two findings–that is, unless the court (1) has found the necessary prior convictions, *and* (2) is of the opinion that the history and the character of the defendant and the nature and circumstances of his or her criminal conduct indicate that extended incarceration and lifetime supervision will best serve the public interest." 5 N.Y.3d at 73 (internal citation omitted) (emphasis in original).

The constitutional defects in Penal Law § 70.10 and C.P.L. § 400.20(1) are still present following *Besser*; since the *Blakely*-offending portions have not been excised from the statute. *Portalatin v. Graham*, 478 F. Supp.2d 385, 399-400 (E.D.N.Y. 2007), *vacated on other grounds and remanded by Besser v. Walsh*, 601 F.3d 163 (2d Cir. 2010). *Contrast with State v. Foster*, 845 N.E.2d at 496 (remedying *Blakely* error in Ohio felony sentencing statute by making the sentencing guidelines advisory) (discussed in *Villagarcia*, 599 F.3d at 537). Although the New

York Court of Appeals in *Rivera* attempted to characterize Penal Law § 70.10 as "merely a recidivist statute–which alone is acceptable under *Apprendi* and *Almendarez-Torres*[,]" this is not an apt description because, as Judge Ciparick of the New York Court of Appeals pointed out, the inquiries under C.P.L. § 400.20(1) and Penal Law § 70.10 do "not end at recidivism" but rather "recidivism is one of two material findings that must be made before an enhanced sentence can be imposed." *Rivera*, 5 N.Y.3d at 79 (Ciparick, J., dissenting) (footnote omitted). As Judge Ciparick explained, the second prong of Penal Law § 70.10 and C.P.L. § 400.20(1) "explicitly requires a judge to review facts that exceed the scope of those found by a jury or admitted by the defendant, to formulate an opinion as to the 'history and character' of the defendant and the 'nature and circumstances of his criminal conduct' and to determine whether 'life-time supervision will best serve the public interest'[.]" *Id.* (quoting N.Y. PENAL LAW § 70.10(2), N.Y. CRIM. PROC. LAW § 400.20(1)(b)).

It further bears noting that there is no procedure by which a jury could have returned a verdict on the factual question mandated to be answered by Penal Law § 70.10 and C.P.L. § 400.20(1), a factor that bears on the lack of harmlessness. *See Washington v. Recuenco*, 548 U.S. at 218 ("If respondent is correct that Washington law does not provide for a procedure by which his jury could have made a finding pertaining to his possession of a firearm, that merely suggests that respondent will be able to demonstrate that the *Blakely* violation in this particular case was not harmless.")).

I note that defense counsel did concede at the beginning of the hearing that Barney was a persistent violent felony offender because he had a certain number of predicate felonies. Transcript of May 26, 1999 Persistent Felony Offender Hearing ("5/26/99 Tr.") at 5-6 ("I believe

we stipulated as to the fact he qualifies for sentencing as a persistent violent felony offender by virtue of the fact he has more than two violent felony convictions for which he could have or was sentenced for more than a year.").  However, the line drawn by *Almendarez-Torres*[21] has been increasingly blurred by *Apprendi* and subsequent cases interpreting *Apprendi*. *See Butler v. Curry*, 528 F.3d at 644 (examining the issue of the "outer bounds of the 'prior conviction' exception after *Apprendi*" and explaining that although the Supreme Court has affirmed *Almendarez-Torres*' exception for prior convictions, it "also recognized that a district court's findings of fact about the basis for a prior guilty plea or conviction at some point 'raise[ ] the concern underlying . . . *Apprendi*,' that is[,] that the Constitution 'guarantee[s] a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence'") (quoting *Shepard v. United States*, 544 U.S. 13, 25 (2005)). "[T]o avoid a potential conflict with the Sixth Amendment, *Shepard* limited the consideration of prior convictions at judicial sentencing to those facts that can be established by the 'prior judicial record' of conviction." *Butler v. Curry*, 528 F.3d at 644 (citing *Shepard*, 544 U.S. at 25-26).

Even assuming that the Supreme Court will adhere to the *Almendarez-Torres* prior felony exception, it is clear, following *Besser*, that the number of predicate felonies alone cannot result in a defendant being sentenced as a persistent felony offender under Penal Law § 70.10. All of the additional factfinding required by New York's persistent felony offender scheme necessarily

---

[21]       Justice Thomas, concurring in part and in the judgment in *Shepard*, observed that "a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided" and suggested that, "in an appropriate case, this Court should consider *Almendarez-Torres*' continuing viability". 544 U.S. at 27-28. "Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of *Almendarez-Torres*, despite the fundamental 'imperative that the Court maintain absolute fidelity to the protections of the individual afforded by the notice, trial by jury, and beyond-a-reasonable-doubt requirements.'" *Id.* (quoting *Harris v. United States*, 536 U.S. 545, 581-582 (2002) (Thomas, J., dissenting)).

entails consideration of information beyond that which could be established by the prior judicial record of conviction. *See Butler*, 528 F.3d at 644-45 (stating that the prior felony conviction "applies only to facts that are directly reflected in the documents of the conviction, not to secondary "facts that are derived or inferred" from a prior conviction or from the conviction documents" and since "the "exception is justified by the reliability of court documents created as part of a process with Sixth Amendment safeguards, it does not extend to facts that may be proven only by reference to documents that were not developed as a result of such process"). The Ninth Circuit explained in *Butler v. Curry* that the *Almendarez-Torres* exception does "not extend to qualitative evaluations of the nature or seriousness of past crimes, because such determinations cannot be made solely by looking to the documents of conviction." 528 F.3d at 644 (citing *United States v. Kortgaard*, 425 F.2d 602, 607, 610 (9th Cir. 2005) (holding that "seriousness" of past crimes and "likelihood of recidivism" are not facts that come within the "prior conviction" exception); *Stokes v. Schriro*, 465 F.3d 397, 404 (9th Cir.2006) (holding that the determination whether the present offense is "strikingly similar" to a past offense does not come within the "prior conviction" exception)).

In addition, the trial court's constitutionally "impermissible factfinding [under Penal Law § 70.10] directed and enabled its selection of the then otherwise-unavailable sentence imposed[,]" *Villagarcia*, 2007 WL 1028528, at *6. Here, the conviction on which Barney was being sentence was for a class D felony, third degree criminal possession of a weapon. Had Barney been sentenced as a persistent violent felony offender for this class D felony, his indeterminate life sentence would have had a minimum term of not less than *12* years and not more than 25 years. N.Y. PENAL LAW § 70.08(3)(c). Because the trial court unconstitutionally

-61-

imposed a sentenced under the persistent felony offender statute, the term of imprisonment was required to have a minimum of not less than *15* years and not more than 25 years. N.Y. PENAL LAW § 70.10. Although Barney did receive the minimum possible under the PFO statute, 15 years to life, it is possible that if Barney had been sentenced as a persistent *violent* felony offender, he could have received a lower minimum sentence–12 years instead of 15 years. *See* N.Y. PENAL LAW § 70.08(3)(c). Of course, the state court was free to impose the same sentence under the persistent violent felony offender statute that it did under persistent felony offender statute, i.e., an indeterminate term of 15 years to life. The possibility remains, however, that Barney could have received a lesser sentence if sentenced as a persistent violent felony offender, particularly under these circumstances where the judge had predetermined his sentence. Had Barney received a 12-year sentence, he would already be eligible for a parole hearing and his earliest release date would be September 12, 2010, three years sooner than it currently is under his 15-year sentence. The New York State Department of Corrections ("NYSDOCS") website indicates that Barney was sentenced on October 4, 1999, and that his earliest release date on his 15 years-to-life sentence is September 12, 2013, with his first parole hearing scheduled for May 2013. *See* NYS DOCS Inmate Lookup,

http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (last accessed July 31, 2010).

Even if it might be likely that Barney will be re-sentenced as a persistent violent felony offender and not receive a more favorable sentence , this is not a sufficient ground to find that the *Apprendi* error was not harmful. *See Villagarcia*, 599 F.3d at 537-39 (rejecting state's argument that the constitutional error was harmless since petitioner's sentencing judge, who sentenced him

-62-

twice to the same sentence, "would undoubtedly impose the same sentence on remand").  As the district court pointed out in *Villagarcia*, "[t]he flaw in this reasoning is that it equates a possibility of no actual prejudice in terms of the eventual sentence received with an actuality of no prejudice resulting from a constitutional error." *Villagarcia v. Warden, Noble Corr. Inst.*, 2007 WL 1028528, *4; *see also id.* ("[B]ecause more than one outcome is possible upon re-sentencing, basing harmlessness on an assumed certainty is flawed. It converts the concept of harmless error in this context into a doctrine of always harmless error. Such conversion is especially dangerous when, as here, the possibility of a different sentence must logically preclude any habeas court from saying for a certainty that the error is harmless.") (citing *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) ( "Under the harmless error test, a remand for an error at sentencing is required unless we are certain that any such error was harmless")). Certainly, the state trial court on remand could not impose a sentence longer than 15 years consistent with due process because any increase in a resentence above the original sentence imposed is presumptively vindictive, and requires an affirmative explanation by the resentencing judge, based on specific conduct or events that have taken place since the original sentence. *North Carolina v. Pearce*, 395 U.S. 711, 725-26, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *accord Wasman v. United States*, 468 U.S. 559, 568 (1984).[22]

An additional and significant factor in showing harmfulness in this case was the judge's definite bias against petitioner and predisposition to sentence him as a persistent felon. The

---

[22]        In *Pearce*, 395 U.S. 711, the Supreme Court set aside the sentence of a state prisoner who had successfully appealed his conviction but upon remand was given a harsher sentence. The Supreme Court stated that a defendant's due process rights were violated when, after a successful appeal, a harsher sentence was imposed as a result of vindictiveness, and further held that if a more severe sentence was imposed following appeal, the reasons for the harsher sentence had appear on the record and be "based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* at 726.

circumstances illustrate the diminishment of the jury's role that comes with increasing reliance on judicial factfinding in sentencing, the primary concern behind the Supreme Court's recent jurisprudence fortifying the Sixth Amendment jury right . *See Oregon v. Ice*, 129 S. Ct. 711, 717 (2009) ("The [Sixth Amendment] rule's animating principle is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense.") (citing *Apprendi*, 530 U.S. at 477). *See also Booker*, 543 U.S. at 236 ("It became the judge, not the jury, that determined the upper limits of sentencing, and the facts determined were not required to be raised before trial or proved by more than a preponderance.").

Here, the scope of Barney's persistent felony offender hearing far exceeded the scope of the jury's findings at trial and without a doubt was based upon more than just recidivism, that is, the number of predicate felonies he had sustained. For the reasons detailed above, the Court therefore concludes that it cannot find harmless error, regardless of whether the state trial court may re-impose the same sentence upon remand, because this Court is in grave doubt about whether the constitutional error had a substantial and injurious effect or influence in determining the sentence imposed.

## IV.    Conclusion

For the reasons stated above, petitioner Steven Barney's petition for a writ of habeas corpus is granted on the grounds that Barney was (1) denied his constitutional right to due process to trial and sentence by an unbiased judge and (2) sentenced in violation of the Sixth Amendment right to a jury trial. Petitioner's sentence is vacated and he is ordered to be re-sentenced  before a different judge. Petitioner must be released unless he is resentenced within forty-five (45) days. The Court dismisses the remainder of the petition and declines to issue a

certificate of appealability as to those claims.

"The CJA [Criminal Justice Act] clearly provides for the appointment of counsel to otherwise qualified individuals 'seeking relief under section 2241, 2254, or 2255 of title 28.'" *Duran v. Reno*, 193 F.3d 82, 84-85 (2d Cir.), *vacated as moot*, 197 F.3d 63, 63 (2d Cir. 1999) (quoting 18 U.S.C. § 3006A(a)(2)); *accord*, *e.g.*, *Lawrence v. I.N.S.*, No. 00 CIV. 2154 AJP, 2000 WL 1864040, at *4 (S.D.N.Y. Dec. 21, 2000). The Court hereby appoints the Federal Public Defender's Office for the Western District of New York, 300 Pearl Street, Suite 200, Buffalo, New York, 14202, as CJA counsel for Petitioner.

This judgment is not stayed pending appeal.

**IT IS SO ORDERED.**

/s/ Hon. Victor E. Bianchini

_____
     VICTOR E. BIANCHINI
    United States Magistrate Judge

Dated: August 6, 2010
     Buffalo, New York.